[Crim. No. 20911. Mar. 24, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
KEITH DANIEL WILLIAMS, Defendant and Appellant.

[Crim. No. 23904. Mar. 24, 1988.]

In re KEITH DANIEL WILLIAMS on Habeas Corpus.

[redacted]

**COUNSEL**

Richard B. Mazer, under appointment by the Supreme Court, for Defendant and Appellant and Petitioner.

John K. Van de Kamp, Attorney General, Edmund D. McMurray, Garrett Beaumont, Jana Tuton and J. Robert Jibson, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**EAGLESON, J.**—A jury convicted Keith Daniel Williams of three counts of first degree murder (Pen. Code, §§ 187, 189)[1] with special circumstances (§ 190.2) and use of a firearm (§ 12022.5). The same jury found that he was sane during the commission of the offenses and determined that death was the appropriate penalty for each offense (§ 190). This appeal is automatic (§ 1239). A petition for writ of habeas corpus was filed in conjunction with

---

[1] All references to code sections are to the Penal Code unless otherwise indicated.

the appeal, and an order to show cause issued thereon. Upon careful examination of each of defendant's numerous arguments, we find no prejudicial error and affirm the conviction. We also conclude that appellant has failed to establish either on the basis of the appellate record or by evidence offered in support of his petition for writ of habeas corpus that his trial counsel failed to provide constitutionally adequate representation. We shall therefore affirm the judgment of conviction, as modified to reflect a single multiple-murder special circumstance, and penalty. The petition for writ of habeas corpus will be denied.

Defendant was charged by information in count I with the murder of Miguel Vargas. The information alleged that the killing was willful, deliberate, and premeditated; was committed with express malice during the commission of robbery (§ 211); and that defendant used a firearm in committing the offense. It was also alleged that three special circumstances existed in that defendant also murdered Salvador Vargas and Lourdes Meza, and committed the murder of Miguel Vargas willfully with deliberation and premeditation during a robbery. The jury found each allegation to be true.

In count II defendant was charged with the murder of Salvador Vargas. The additional allegations differed only in the first special circumstance, that charging also the murder of Miguel Vargas. Again the jury found each allegation to be true.

Count III charged defendant with the willful, deliberate and premeditated murder of Lourdes Meza, alleging that this murder had been committed with express malice and during the commission of robbery, kidnapping (§ 207), and rape (§ 261), with use of a firearm. The four special circumstances alleged were that defendant also murdered Miguel and Salvador Vargas, and committed the murder of Lourdes Meza during a rape and a kidnapping. The jury found that the offense did not occur during a rape, rejected the rape special circumstance, and otherwise found the allegations of count III to be true.

In a multifaceted attack on the conviction and sentence which we summarize here and address in detail below, defendant argues that the trial court erroneously admitted evidence of his prior criminal record and other criminal conduct; that lay opinion evidence was admitted erroneously; and that he received constitutionally inadequate assistance by his appointed counsel during the guilt, sanity, and penalty phases of the trial.[2] He also

---

[2] Evidence outside the record on appeal was introduced in the habeas corpus proceeding in support of this claim. Reference will be made to this evidence where appropriate in the sections of this opinion dealing with the appeal. The habeas corpus petition will be separately treated in this opinion.

argues that he was improperly charged with and convicted of more than one "multiple-murder" special circumstance, and that the robbery and kidnapping special circumstances must be set side because he was not separately charged with and convicted of those offenses.

In his attack on the finding that he was sane at the time of the commission of the offense, defendant claims that the court's instructions to the jury were confusing and erroneous. As to the penalty trial he alleges that he was prejudiced by prosecutorial misconduct; that the court's instructions were not adequate; that error occurred in the appointment of psychiatrists and in permitting the jury to consider various evidence admitted during the guilt and sanity phases of the trial; that the trial court erred in declining to modify the penalty; and that the death penalty is disproportionate as a matter of law. In addition he argues that the 1977 death penalty law, under which he was tried, convicted, and sentenced, is unconstitutional under the Eighth and Fourteenth Amendments to the United States Constitution.

## GUILT PHASE EVIDENCE

With the exception of conflicting evidence as to the quantity of alcohol and drugs defendant had consumed and its possible effect on his mental state at the time of the homicides, the evidence is essentially undisputed. The events leading up to and most relevant to the homicides commenced during the latter half of September 1978 when defendant and Robert Tyson (hereafter identified as Tyson) stole a .22 Beretta pistol and several other items from their employer of one week, Terry Judd, in Corning. On Saturday, September 30, 1978, they robbed a couple who had parked their camper in the John Street Park in Modesto, taking from them the camper and its contents. After the robbery they drove the camper to the Tyson residence near Galt where the contents were removed. Some were sold on Sunday. On Monday, October 2, appellant drove the camper to the area of Lake Camanche and burned it. Tyson and Karen Tyson (hereafter identified as Karen) accompanied him in another vehicle.

Among the items in the camper was a checkbook. The other valuables taken from the camper were kept at the Tyson residence and offered for sale there at a yard sale conducted by Karen over the four-day period from October 4 through October 7. Miguel Vargas and Lourdes Meza, who lived with Miguel on a dairy ranch near Merced, attended the yard sale on Friday, October 6. Notwithstanding their limited English and defendant's limited Spanish, defendant conveyed to Miguel an interest in purchasing Miguel's car. Defendant road-tested the car and noted that the registration was in the glove compartment. No purchase was agreed upon at that time.

Defendant told Tyson and Karen that it would have been easy to load Miguel and Lourdes into the trunk of the car and take them to a field.

Miguel and Lourdes returned to the Tyson home on Saturday and completed the sale. Defendant paid for the car with a $1,500 check written on one of the checks stolen earlier in the Modesto robbery. Defendant took possession of the car, but Miguel retained possession of the registration slip with the understanding that it would be turned over to defendant when the check cleared on Monday. Defendant gave Miguel a receipt for the car. Later that day Miguel returned to the Tyson home and offered to buy the Beretta from defendant. At that time Miguel displayed a "wad" of bills from which he proposed to make payment. Defendant noted that Miguel had the check in his shirt pocket.

On Sunday, October 8, defendant and Tyson drove to the home which Miguel and Lourdes shared with Miguel's cousin Salvador Vargas. Their purpose was to rob, and they had discussed killing Miguel and Lourdes. Defendant intended to take the money he had seen in Miguel's possession, and to take any other items that might be pawned. He also planned to obtain the registration slip and to retrieve both the check and the receipt defendant had given for the car. Defendant, armed with the fully loaded 10-shot Beretta, and Tyson, armed with a 9-shot semiautomatic .22 Storm-Luger pistol, arrived at the Vargas home in the early evening only to find a complicating factor—guests were visiting. Leaving their weapons in the car they joined the group in the house: Miguel, Lourdes, and their three visitors. Salvador had retired to an upstairs bedroom as he was scheduled to work at 11 p.m. Defendant spoke of the car's excellent performance and mileage, assured Miguel that the check which Miguel still had in his pocket was good, and said he would meet Miguel at the bank on Monday to help him cash the check.

The visitors soon departed. Defendant and Tyson returned to their car where they retrieved their guns. Miguel had again expressed interest in purchasing the Beretta. When they reentered defendant held the Beretta at Miguel's neck. Miguel thought he was joking and Tyson pulled defendant's arm away, explaining to defendant later that his own gun was not loaded, and that he had seen Salvador on the second floor. Defendant then suggested they all go out together for a drink, but Miguel declined because he had to work. Tyson proposed that he and defendant get some beer and bring it to the house. Defendant left with Tyson.

Tyson testified that he had hoped defendant would abandon his plan once they left the house, but defendant did not do so. Rather, he told Tyson that he "wanted to take him out right then." Defendant then outlined his

scheme telling Tyson that Tyson was to make Miguel lie down while defendant took care of Salvador upstairs. The pair then returned to the Vargas house. Miguel opened the door. Miguel again believed defendant was joking when defendant ordered him to lie down, but he did so when Tyson repeated the command. Defendant ran up the stairs where he yelled at Salvador and Lourdes to be quiet. He then directed Tyson to bring Miguel upstairs. When Tyson did so he saw Salvador lying on the floor. Defendant ordered Miguel into a bedroom and told him to lie down. He then directed Tyson to take Lourdes downstairs and shoot her. Tyson took her to a downstairs bedroom. He heard defendant threaten to shoot Miguel and Salvador if they did not tell him where their money was. He then heard four shots.

Defendant described the homicides in his testimony on cross-examination, acknowledging both that the purpose of the trip to Merced had been to rob Miguel and Lourdes, and that he had discussed killing them. He shot Miguel, after hollering at him about the money, when Miguel turned with a gun and lunged at defendant. Miguel did not point his gun at defendant and seemed to be trying to escape. Although other evidence established that the bodies of Miguel and Salvador were found inside the room and had been shot in the location where found, defendant testified that he shot Miguel at the door to the bedroom, and then shot Salvador as Salvador began crawling as if to enter the bedroom. He shot Salvador twice in the head and then shot Miguel, who was moving, a second time. He then took the gun that Miguel still held in his hand, as well as the check and receipt for the auto which were in Miguel's shirt pocket, and a second gun that was under a pillow on the bed.

Defendant ordered Tyson upstairs to view the bodies telling Tyson the carnage occurred because Tyson had disobeyed defendant's order to disarm Miguel. Defendant took Lourdes's wallet from a kitchen table, and left the house with Tyson and Lourdes. He testified that he drove to an unpopulated area near Sonora for the purpose of killing Lourdes. On the way defendant had intercourse with her. Tyson remained in the car while defendant took her into a field saying that he only wanted to have intercourse with her again. There, in the early morning hours of Monday, October 9, 1978, he shot her four times. When he returned to the car he said to Tyson: "I f. . .d her . . . and I killed [her]. I love to kill." He then ordered Tyson to retrieve some beer cans Tyson had thrown out of the car so there would be no fingerprints.

The bodies of Miguel and Salvador were discovered on Monday morning. Tyson surrendered on October 13, 1978, and led authorities to the location near Sonora where the body of Lourdes was found. Defendant was arrested

in Arizona in late November and returned to Merced for trial. While in custody in Arizona he confessed.

The defense was diminished capacity resulting primarily from a prolonged course of drug and alcohol abuse. Defendant's mother described symptoms of illness suffered by defendant in his early childhood which she believed were indicative of epilepsy. She testified that he also suffered a head injury when he was 15 which caused a concussion and unconsciousness. After his marriage he drank heavily, and in 1972 she became aware of his use of drugs, including mescaline, "acid," marijuana, and "speed." In October 1978 she found three or four needles and a burned spoon in her home in Corning where defendant had been staying in September during her absence.

Defendant corroborated his mother's testimony regarding his use of alcohol and controlled substances. He began drinking alcoholic beverages when he was 14 or 15 years old, consuming them whenever the opportunity presented itself. His consumption increased when he left his mother's home at age 19. He drank whatever was available, usually wine or beer, and sometimes stole from a liquor store. His daily consumption was as high as a case of 24 cans of beer, and he was also "strung out" on heroin. He would often drink a pint of tequila before or with the beer.

The first period during which petitioner was unable to obtain alcohol was when he was confined to the Deuel Vocational Institution at Tracy at age 19. Prison-made "pruno" was available, but it made defendant sick. He was confined for 18 months and began drinking again as soon as he was released. His wife brought alcohol to him when she came to pick him up. He continued to drink except when institutionalized. His first commitment was that to Deuel Vocational Institution for theft of a motorcycle, the next was to the federal penitentiary at Lompoc for interstate transportation of a stolen car. He was recommitted for parole violation after a 1972 assault with a deadly weapon.

While at the farmhouse in Merced on October 8 he drank a straight shot of whiskey from a glass and had a beer with it. Just prior to that trip he had consumed two or three fifths of alcohol.

In addition to his consumption of alcohol, at age 14 or 15, defendant began "chipping" heroin whenever he could get it. Alcohol "mellowed" defendant. Heroin put him in a dream-like state in which he did not let things bother him. Defendant testified that he also used mescaline, "acid," Methedrine, Benzedrine, cocaine, and marijuana. He injected speed directly into his veins. When he ate mescaline he would go on an eight-hour trip of

hallucination. In Corning in September 1978 he began using "speed," heroin, barbiturates, Valium, and marijuana.

Defendant described in some detail the events leading up to the homicides, commencing with the robbery at the Modesto park, explaining that on that day he had used morphine and Valium in the morning, smoked marijuana, and consumed diet pills. On Friday, October 6, he had again used heroin, morphine, and Valium. He had also smoked marijuana, and had drunk two to three 6-packs of beer as well as two or three glasses of tequila. In the evening he had LSD. On Saturday he had used less, but had shared a bag of heroin with his former wife, Cindy, had drunk wine, ingested Valium, injected morphine, and smoked marijuana. Prior to 4 p.m. on Sunday he used a bag of heroin. With the money from the forged checks that had been cashed in Stockton he purchased more heroin, but it proved to be "bunk." He injected morphine twice, using one cc each time. Before leaving for Merced he drank approximately eight cans of beer, and smoked marijuana. On the way to Merced he ate four "blue" Valium tablets, consumed another eight cans of beer, and at the Vargas home drank a glass of whiskey. Later that evening, on the way to Sonora, he drank two cans of beer.

In response to his attorney's questions about the pattern of drug use in his life, defendant testified that he had used drugs continuously from the time that he was 14 or 15 years old, including the time during which he was in prison where it was easier to obtain them than on the street. On cross-examination he acknowledged that he remembered his prior criminal acts of stealing a motorcycle, transporting a car across state lines, assault with a deadly weapon, and teenage thefts of alcohol. No objection was made to any of these questions other than to that about the motorcycle theft. An objection that the question assumed a fact not in evidence was overruled. Defendant also acknowledged that he had escaped from a halfway house to which he had been transferred prior to an anticipated parole from prison in July 1978. While in prison he had been withdrawn from drugs.

Defendant admitted taking the Beretta from a workshop at the Judd residence. He also acknowledged that he and Tyson had taken a pellet rifle and tools, and testified that at that time he was using drugs.

Dr. Brannan, a psychiatrist who had been appointed to determine defendant's sanity at the time of the offense and his competency to stand trial, was also called as an expert to give his opinion as to defendant's mental capacity. His testimony did not prove helpful to the defense, however. In Dr. Brannan's opinion defendant did not suffer from any mental illness that would preclude him from having the intent to rob or kidnap for the purpose

of robbery. The witness could not determine, based on his examination, the extent to which defendant might have been under the influence of drugs and alcohol at the time of the offenses, or whether defendant actually had the ability to premeditate, deliberate, intend to kill and to harbor malice. The witness testified, however, that drugs and alcohol, or a combination thereof, could have a tendency to affect a person's ability to have those mental states, but that a person who used drugs all of the time would have a higher tolerance. The peak of drug intoxication would occur approximately four to six hours after intake. The witness was given a hypothetical of a person who consumed an eight-ounce glass of eighty-six proof whiskey within thirty minutes to an hour prior to a killing at 8 p.m. and two beers at about the same time; six 12-ounce cans of beer and four Valium tablets within an hour before that; and in four hours prior to 4 p.m. had smoked three marijuana cigarettes, drunk eight cans of beer, injected a cc of morphine in a minimum solution; and on the preceding night had eaten twelve Valium blues and injected morphine, as well as an eighth of a teaspoon of street heroin. The witness opined that the person would be sleepy, slurred in speech, have an irregular walk, and be drowsy. He might feel sleepy and euphoric from the morphine, depending on the history of use. The doctor believed it would be unusual for a person to have physical and mental effects of that nature without affecting the person's ability to form the specific intent elements of crime. In the opinion of the witness a person who had ingested the hypothetical quantity of drugs, but was able to rush upstairs, walk and talk rapidly without slurring his speech, would not be too intoxicated on drugs. If his thinking ability was clouded so that he did not think rationally and clearly, however, his ability to plan and premeditate would also be clouded or impaired to some extent, and he would not be able to premeditate, deliberate, and harbor malice. In the opinion of the witness, defendant did not suffer from any chronic alcohol illnesses that affected his brain although he might be an alcoholic.

Dr. Brannan believed that defendant was of at least average intelligence. He testified that a person who committed an offense while heavily under the influence of drugs would not be expected to have recall or memory of the details, nor would he be expected to successfully operate a vehicle at high speeds over a considerable distance. By history defendant was a sociopath who would be capable of killing three people without being under the influence of drugs. Defendant had shown no remorse during the examination. Based on what defendant said and what the witness had heard in court, Dr. Brannan believed that defendant could have intended to kill.

Dr. Brannan testified on recross, without objection, that his examination report reflected that defendant had told him that he "rejects authority and always will. He does not go for this rehabilitation bullshit to use his words.

He goes to the same code of ethics whether he's inside or outside of jail. He's very prejudiced against Mexicans."

## GUILT PHASE

1. *Admission of Evidence of Uncharged Crimes and of Prior Convictions*

Defendant asserts error in the admission of evidence of the theft of property from Terry Judd in Corning, and of the camper robbery at the John Street Park in Modesto, the threat to kill the victims of the robbery, and the subsequent arson of the camper. He argues that the evidence was not admissible under Evidence Code section 1101, subdivision (b), to provide intent, motive, or premeditation, and was not admissible to show his state of mind, or to rebut his diminished capacity defense.

Defendant also argues that evidence of his prior criminal history—the motorcycle theft, assault with a deadly weapon, transportation of a stolen vehicle, and escape from custody—was not properly admitted for impeachment and was not admissible to rebut his diminished capacity defense.

We address first the admissibility of evidence of uncharged crimes.[3] Because evidence of other criminal conduct is inherently prejudicial special rules govern admissibility. Evidence of an uncharged offense is among the statutory exceptions to the rule that all relevant evidence is admissible. (Evid. Code, § 351.) As character evidence in the form of evidence of specific instances of unlawful conduct it is made inadmissible to prove the defendant's conduct on the instance of the charged offense by subdivision (a) of Evidence Code section 1101. Subdivision (b) of that section provides a limited basis for admission, however: "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident) other than his disposition to commit such acts." Even when admissible, evidence of prior criminal conduct must be subjected to special scrutiny to insure that its probative value outweighs the prejudice inherent in the possibility that a jury may consider uncharged criminal conduct as evidence of the defendant's propensity to commit crimes. (Evid. Code, § 352; *People* v. *Schader* (1969) 71 Cal.2d 761, 772 [80 Cal.Rptr. 1, 457 P.2d 841].)

---

[3] Inasmuch as the offenses in this case were committed prior to June 8, 1982, questions related to the admissibility of evidence are unaffected by article I, section 28 of the California Constitution. (*People* v. *Tassell* (1984) 36 Cal.3d 77, 82, fn. 1 [201 Cal.Rptr. 567, 679 P.2d 1]; *People* v. *Smith* (1983) 34 Cal.3d 251, 257 [193 Cal.Rptr. 692, 667 P.2d 149].)

The considerations governing admission of evidence of uncharged crimes were examined in *People* v. *Thompson* (1980) 27 Cal.3d 303, 314-316 [165 Cal.Rptr. 289, 611 P.2d 883]. "The admission of any evidence that involves crimes other than those for which a defendant is being tried has a 'highly inflammatory and prejudicial effect' on the trier of fact. This court has repeatedly warned that the admissibility of this type of evidence must be 'scrutinized with great care.' '[A] closely reasoned analysis' of the pertinent factors must be undertaken before a determination can be made of its admissibility.

■ "Evidence of an uncharged offense is usually sought to be admitted as 'evidence that, if found to be true, proves a fact from which an inference of another fact may be drawn.' (See CALJIC No. 2.00 (1979 Revision) (4th ed. 1979).) As with other types of circumstantial evidence, its admissibility depends upon three principal factors: (1) the *materiality* of the fact sought to be proved or disproved; (2) the *tendency* of the uncharged crime to prove or disprove the material fact; and (3) the existence of any *rule* or *policy* requiring the exclusion of relevant evidence. [Citations.]

■ "In order to satisfy the requirement of *materiality,* the fact sought to be proved may be either an ultimate fact in the proceeding or an intermediate fact 'from which such ultimate fact[ ] may be presumed or inferred.' [Citation.] Further, the ultimate fact to be proved must be 'actually in dispute.' [Citation.] If an accused has not 'actually placed that [ultimate fact] in issue,' evidence of uncharged offenses may not be admitted to prove it. (*People* v. *Thomas* (1978) 20 Cal.3d 457, 467 [143 Cal.Rptr. 215, 573 P.2d 433]; see also *People* v. *Antick* (1975) 15 Cal.3d 79, 93 [123 Cal.Rptr. 475, 539 P.2d 43]; . . .) The fact that an accused has pleaded not guilty is not sufficient to place the elements of the crimes charged against him 'in issue.' (*People* v. *Schader, supra,* 71 Cal.2d 761, 775-776, fn. 13.)

"In ascertaining whether evidence of other crimes has a *tendency* to prove the material fact, the court must first determine whether or not the uncharged offense serves 'logically, naturally, and by reasonable inference' to establish that fact. [Citations.] The court 'must look behind the label describing the kind of similarity or relation between the [uncharged] offense and the charged offense; it must examine the precise elements of similarity between the offenses with respect to the issue for which the evidence is proffered and satisfy itself that each link of the chain of inference between the former and the latter is reasonably strong.' [Citation.] If the connection between the uncharged offense and the ultimate fact in dispute is not clear, the evidence should be excluded. [Citations.]" (Italics in original, fns. omitted.)

With these guidelines in mind, we examine the specific items of evidence to which this claim is directed.

## A. The Judd Theft

Terry Judd testified that on Saturday afternoon, September 30, he noticed that his Beretta semiautomatic, a rifle, a pellet gun, a router, a hammer, and a reciprocating saw were missing from the shed in his shop area. The objection was to the relevancy of the evidence to an issue in the trial.[4] Although the objection did not specify that, as prior crimes evidence, the theft was inadmissible under Evidence Code sections 352 and 1101, subdivision (b), unless it satisfied the admissibility criteria summarized in *Thompson, supra,* 27 Cal.3d 303, we believe that it was sufficiently specific to encompass a *Thompson* objection, i.e., that the People were offering evidence of uncharged criminal conduct by the defendant, that defendant had not put in issue any element of the offense or issue necessary to the People's case-in-chief to which that crime was relevant, and that any relevance the evidence might have if admissible was outweighed by its inherently prejudicial nature.

A verdict may not be set aside on the basis of the erroneous admission of evidence, even if prejudicial, unless the party asserting error has preserved the question by a timely and specific objection to the admission of the evidence, or by a motion to strike or exclude the evidence. (Evid. Code, § 353; *People* v. *Green* (1980) 27 Cal.3d 1, 22, fn. 8 [164 Cal.Rptr. 1, 609 P.2d 468]; see also *People* v. *Collie* (1981) 30 Cal.3d 43, 49, fn. 1 [177 Cal.Rptr. 458, 634 P.2d 534, 23 A.L.R.4th 776].) A general objection on grounds of relevancy is not adequate to preserve an issue with respect to admission of other-crimes evidence for appeal. (*People* v. *McDaniel* (1976) 16 Cal.3d 156, 176 [127 Cal.Rptr. 467, 545 P.2d 843].) If the defendant objects that the evidence to be offered will show the commission of an uncharged offense, the People bear the burden of demonstrating admissibility. (*People* v. *Schader, supra,* 71 Cal.2d 761, 772, fn. 4.) While no particular form of objection is required (*People* v. *Gibson* (1976) 56 Cal.App.3d 119, 137 [128 Cal.Rptr. 302]), the objection must be made in such a way as to alert the trial court to the nature of the anticipated evidence and the basis on which exclusion is sought, and to afford the People an opportunity to establish its admissibility. (See *Bundy* v. *Sierra Lumber Co.* (1906) 149 Cal. 772, 776 [87 P. 622]; *Cramer* v. *Morrison* (1979) 88 Cal.App.3d 873, 886 [153 Cal.Rptr. 865].)

Although defendant did not identify the specific nature of his objection or state that the evidence would show an uncharged crime, and the People

---

[4] Counsel stated: "Your Honor, I'm going to object to that question upon the grounds of relevancy, unless he relates it to some issue in this trial."

made no offer of proof, the prosecutor's opening statement to the jury had already made clear the nature of the evidence to be introduced.[5] The circumstances in which an objection is made should be considered in determining its sufficiency. (See *People* v. *Golden* (1961) 55 Cal.2d 358, 369-370 [11 Cal.Rptr. 80, 359 P.2d 448].) ■ When, as here, the People have already made it clear that the evidence will show the commission of an uncharged crime, and the defendant objects on grounds that the People have not shown that the evidence is relevant to any issue in the case, the objection is sufficient to alert the court that admissibility must be determined under the criteria of Evidence Code sections 1101, subdivision (b), and 353, and *People* v. *Thompson, supra,* 27 Cal.3d 303, 314-318.[6]

■ The People now argue that the evidence of the Judd thefts was relevant to establish intent, an element of the charged offenses put in issue by defendant's anticipated diminished capacity defense.[7] Under the People's

---

[5] The prosecutor had advised the jury that evidence would be presented that defendant and Tyson had been working for Judd who owned two Beretta weapons which they had fired together, and that "during that week, Mr. Williams and Mr. Tyson left on the 29th and were not to be seen by Mr. Judd again—nor were his reciprocating saw, or his drill, or his router, or one of his Beretta weapons, as well as a rifle and a pellet gun." The prosecutor also told the jury that Judd had reported the items to police as missing. We think it clear that this statement indicated that the jury would be expected to infer that defendant and Tyson had stolen the missing items.

[6] The statement of the objection here, and the context in which it was made, distinguish this case from *People* v. *Green, supra,* 27 Cal.3d 1, 21-22, on which the People rely. There the trial objection had been that a question was leading, but on appeal defendant argued that the evidence should have been excluded because it was evidence of other crimes. We stated there that "[d]efendant's objection to the testimony on the sole ground that the questions were 'leading' did not preserve a claim of a *wholly different basis* of exclusion such as he now raises." (27 Cal.3d at p. 22, fn. 8, italics added.)

[7] Defendant argues that evidence of uncharged crimes may not be introduced until the defendant puts in issue the point to which the evidence is relevant. He relies on our statement in *People* v. *Thompson, supra,* 27 Cal.3d 303, 315, that a plea of not guilty does not put in issue the elements of the offense. The People, of course, bear the burden in their case-in-chief of proving the elements of the charged crime and the identity of defendant as the perpetrator. *Thompson, supra,* 27 Cal.3d 303, did not hold that, if otherwise admissible, evidence of uncharged crimes may not be introduced during the People's case-in-chief on a showing that an issue will be raised as to the existence of the element or identity of the perpetrator, or if the judge is satisfied that the evidence is necessary to establish an element of the offense and avoid a directed verdict. (See § 1118.1.) The defendant may not, of course, be required to alert either the court or the prosecutor to the defenses he intends to raise or any issue that may be in doubt. (See *People* v. *Collie, supra,* 30 Cal.3d 43; *People* v. *Belton* (1979) 23 Cal.3d 516 [153 Cal.Rptr. 195, 591 P.2d 485].) In order to meet their burden of proof the People must be permitted, *when necessary,* to introduce otherwise admissible evidence of uncharged crimes. (*People* v. *Alcala* (1984) 36 Cal.3d 604, 631 [205 Cal.Rptr. 775, 685 P.2d 1126]; *People* v. *Montalvo* (1971) 4 Cal.3d 328, 331-332 [93 Cal.Rptr. 581, 482 P.2d 205, 49 A.L.R.3d 518].) In this case, for example, had there been no other evidence of the identity of the perpetrator of the murders, and had the stolen Beretta been shown to be the murder weapon, evidence of the theft might have been sufficiently relevant on the issue of identity since the theft by defendant permitted an inference that he was still in possession of the gun on the date of

theory the Judd thefts marked the beginning of a crime spree that included the camper robbery and culminated in the murders. They suggest that evidence of defendant's need for money and the series of acts designed to obtain money, including the Judd theft and the camper robbery, demonstrated that the defendant's drug and alcohol intoxication did not affect his ability to engage in purposeful conduct—that is, if he was mad there was method to his madness. Alternatively they suggest that the evidence was admissible to show a common scheme or plan, arguing that as evidence of a larger plan of which these offenses were part it was unnecessary to show that the offenses were similar.

Without question defendant's mental state was in issue during this trial. He was charged with murder in which malice is an element. (§§ 187, 188.) The information alleged that the murder was of the first degree in that it was willful, deliberate, premeditated, and that it was committed with express malice, i.e., that an express intent to kill was present. (§ 188.) Each of these specific mental states is an element of the offense on which the People bear the burden of proof beyond a reasonable doubt. (§ 1096; *Mullaney* v. *Wilbur* (1975) 421 U.S. 684 [44 L.Ed.2d 508, 95 S.Ct. 1881]; *In re Winship* (1970) 397 U.S. 358 [25 L.Ed.2d 368, 90 S.Ct. 1068]; *People* v. *Montalvo, supra,* 4 Cal.3d 328, 333.) In addition it was alleged that the murders had been committed during the commission of a robbery, and that the Meza murder had also been committed during a rape and kidnapping. The elements of robbery include a specific mental state—the intent to deprive another of his property (*People* v. *Green, supra,* 27 Cal.3d 1, 54; *People* v. *Butler* (1967) 65 Cal.2d 569, 572-573 [55 Cal.Rptr. 511, 421 P.2d 703])—while any of these special circumstances could be satisfied by evidence that the murders were intentional and occurred during an attempt to commit those offenses. The specific intent to commit the target offense is an element of an attempt. (*People* v. *Martinez* (1980) 105 Cal.App.3d 938, 942 [165 Cal.Rptr. 11].) To meet their burden of proof it was necessary that the People introduce evidence of all of these specific mental elements of the charged offenses and special circumstances. Not only were these elements in issue by virtue of the charges, but it was clear that the People knew that defendant contemplated a diminished capacity defense based on mental defect or deficiency, and drug and alcohol intoxication, any of which could negate the specific mental elements of the charged offenses and special circumstances.

However, no evidence was offered to suggest that defendant had ingested drugs and/or alcohol at the time of the Judd thefts, or that if he had used

the murders only a week later. (See *People* v. *Thompson, supra,* 27 Cal.3d 303, 318; *People* v. *Schader, supra,* 71 Cal.2d 761, 774-775.)

such substances at those times, the amount was similar to the amount ingested in the hours prior to the charged offenses. Thus, if the proposed basis for admissibility was to demonstrate that defendant's tolerance to drugs was so high that his capacity to achieve the specific mental states that were elements of the charged offenses would not have been affected by his ingestion of large quantities of alcohol and drugs at the time they were committed, the argument fails. There was simply no evidence that defendant's mental state was the same at the time he committed the theft as it was at the time the murders were committed, or that if it was the same, it was so notwithstanding the ingestion of similar quantities of drugs and alcohol at both times. The probative value of the evidence was minimal and was clearly outweighed by its potential prejudicial effect.

The conclusion does not differ if a common scheme or plan is offered as the basis for admission of the Judd thefts. It is not enough to identify an admissible purpose such as common plan or scheme as the People now do. They must also show that such a plan actually existed, that the uncharged offense was a part thereof (*People* v. *Tassell, supra,* 36 Cal.3d 77, 84), that the evidence of the uncharged offense is not cumulative, and that the evidence is sufficiently probative to outweigh its prejudicial effect. (*People* v. *Alcala, supra,* 36 Cal.3d 604, 631-632; *People* v. *Thompson, supra,* 27 Cal.3d 303, 318; *People* v. *Guerrero* (1976) 16 Cal.3d 719, 724 [129 Cal.Rptr. 166, 548 P.2d 366]; *People* v. *Schader, supra,* 71 Cal.2d 761, 774-775.)

The evidence does not support a conclusion that defendant was engaged in a series of offenses that were part and parcel of "a single conception or plot," or "grand design." (*People* v. *Tassell, supra,* 36 Cal.3d at p. 84.) It establishes nothing more than a series of random crimes directed against targets of opportunity and committed whenever financial necessity dictated. Furthermore, even were the Judd theft part of a larger planned course of criminal conduct, this common scheme evidence is not shown to have been relevant to an issue in the case. The ability to "engage in purposeful conduct," the issue to which the People argue the evidence was relevant, was not an issue in the People's case-in-chief. Such an ability could not establish any of the mental elements of the crimes and/or special circumstances charged in the information. The ability to engage in "purposeful conduct" would be relevant only to rebut a defense of drug- or alcohol-induced unconsciousness. (See *People* v. *Conley* (1966) 64 Cal.2d 310, 323-324 [49 Cal.Rptr. 815, 411 P.2d 911].) The People may not in their case-in-chief anticipate fanciful defenses in order to create an issue as a basis for introduction of highly prejudicial evidence of uncharged offenses. (*People* v. *Schader, supra,* 71 Cal.2d 761, 775-776, fn. 13.)

Because we shall conclude that the evidence of the camper robbery and arson was admissible, however, and because the other evidence of guilt was

overwhelming, we are satisfied that the erroneous admission of evidence regarding the Judd theft was not prejudicial.

### B. *The Camper Robbery/Arson*

Although appellant now argues that evidence of the camper robbery was not relevant to any issue in the case, he did *not* object to admission on this ground. The People introduced the evidence through the testimony of Karen Tyson to whom appellant had described the incident in explaining to her how he and Robert Tyson had obtained the camper which they brought to her home.

The only defense objection to admission of evidence regarding the theft of the camper was to the testimony by Karen Tyson that defendant had admitted his participation to her. The objection was based on the absence of evidence other than defendant's out-of-court statement to establish the corpus delicti of that offense. The evidence was offered by the People to show defendant's state of mind, intent, and motive when the homicides were committed, or alternatively to prove identity of the killer by showing a common scheme or plan.

The trial court overruled the objection before the witness was permitted to answer but gave cautionary instructions. These instructions advised the jury that although the evidence to be received might show that defendant had committed a crime other than that for which he was on trial, it must not be used to prove he had a bad character or disposition to commit crimes. The court also explained the limited purpose of showing the identity of the person who committed the charged crimes, the intent which was an element of those crimes, and a characteristic method, plan, or scheme in committing the charged offenses.

The People's theories of admissibility of evidence of the Judd and camper offenses were, first, that they and the homicides were all committed during a crime "spree" with the intent to steal and had a common motive to obtain money because defendant and Tyson were unemployed, had no source of income and were without funds, and, second, that the evidence was relevant to defendant's intent in killing Salvador, Miguel and Lourdes. The evidence would show both an intent to commit robbery and that notwithstanding the anticipated defense of drug and alcohol intoxication defendant was capable of having the intent to steal and/or to kill, as well as harboring malice, and could premeditate and deliberate.

The People now concede that the corpus delicti rule is applicable to evidence of uncharged crimes introduced to prove the commission of those

crimes. (*People* v. *Robertson* (1982) 33 Cal.3d 21, 41 [188 Cal.Rptr. 77, 655 P.2d 279].) We agree, however, that the corpus delicti rule was satisfied and there was no error in admitting the evidence of the camper robbery. The corpus delicti was established independently of Karen's testimony regarding defendant's extrajudicial admission. Tyson described in detail the events at the John Street Park. ■ Although he was an accomplice, no further corroboration of his testimony was required since the camper robbery was not a charged offense. (*People* v. *Belton, supra,* 23 Cal.3d 516, 523.) The order of proof of the corpus delicti of an offense is within the discretion of the trial judge. (§§ 1093, 1094; Evid. Code, § 320; *People* v. *Amaya* (1952) 40 Cal.2d 70, 76 [251 P.2d 324]; *People* v. *Mehaffey* (1948) 32 Cal.2d 535, 547-548 [197 P.2d 12].) Although the court here may not have exercised that discretion, defendant does not suggest, and we do not perceive, a basis on which to conclude that the admission of Karen's testimony prior to that of Tyson was prejudicial. The court's possible failure to admit the evidence under this rationale is irrelevant. ■ When evidence is properly received the basis for the court's ruling is not material. (*People* v. *Schader, supra,* 71 Cal.2d 761, 777; *Wilcox* v. *Berry* (1948) 32 Cal.2d 189, 192 [195 P.2d 414].)

Inasmuch as there was no error in admitting evidence of the camper robbery, defendant's claim that the evidence should have been excluded on grounds other than those put forward by counsel in his objection may be considered only in the context of his claim that counsel's failure to object on other grounds demonstrates ineffective representation.

Whether counsel afforded constitutionally adequate assistance is a topic to be discussed separately below. In this context, however, we find no indicia of incompetence in the failure to object because the evidence was relevant to motive, and thus to both intent and identity. The check which appellant used purportedly to pay for the car purchased from Miguel was one of those stolen in the camper robbery. One acknowledged purpose for the trip to Miguel's home in Merced was to retrieve the check. The logical conclusion is that defendant feared that he would be identified as the perpetrator of the camper robbery if the check were to be negotiated. That the check was missing when Miguel's body was discovered is circumstantial evidence that appellant was the killer, and that he had the intent to rob and to kill when he took the check.

The record on appeal does not reveal counsel's reason for objecting only on corpus delicti grounds. ■ However, only if a meritorious basis for an objection exists does failure to make the objection suggest possible incompetence, and only if admission of the objectionable evidence is prejudicial does that incompetence warrant reversal. Manifestly, the failure to make a meritless objection to the admission of evidence neither affects the outcome of

the case nor demonstrates performance that falls below accepted standards of professional competence.

The admission of evidence regarding the camper robbery does not afford a basis for relief under either theory put forward by defendant. While evidence of the arson is not as probative as that regarding the robbery and theft, it too was relevant to defendant's identity as the killer and motive for killing, since it also demonstrated defendant's effort to destroy evidence linking him to the robbery. We find neither error in the admission of that evidence nor a basis for holding that counsel failed to afford constitutionally adequate assistance in failing to object to its admission on the ground now suggested by defendant.

## C. *Prior-crimes Evidence*

Defendant acknowledges that evidence of his criminal history was introduced by his own testimony, elicited during direct examination by his own counsel. ▮▮▮ It is axiomatic that a party who himself offers inadmissible evidence is estopped to assert error in regard thereto. (*People* v. *Moran* (1970) 1 Cal.3d 755, 762 [83 Cal.Rptr. 411, 463 P.2d 763].) He argues, however, that counsel presented this evidence only after the trial court had ruled that the prosecutor would be permitted to offer evidence of prior convictions to rebut the diminished capacity defense that was to be presented. We infer from his argument that defendant's basis for urging error in the admission of his own testimony is that an erroneous preliminary ruling on the admissibility of evidence to be offered by the prosecution compelled him, for tactical reasons, to present the evidence he now claims was inadmissible.

▮▮▮ We need not decide here whether in such circumstances the requirement that there be a timely and specific objection to the introduction of evidence to preserve the question of admissibility for appeal applies (see Evid. Code, § 353, subd. (a); *People* v. *Green, supra,* 27 Cal.3d 1, 21-22), because an *in limine* ruling on admissibility is not binding if the evidence is later introduced. (See *People* v. *Campa* (1984) 36 Cal.3d 870, 885-886 [206 Cal.Rptr. 114, 686 P.2d 634]; *People* v. *Superior Court (Zolnay)* (1975) 15 Cal.3d 729, 735 [125 Cal.Rptr. 798, 542 P.2d 1390]; *Saidi-Tabatabai* v. *Superior Court* (1967) 253 Cal.App.2d 257, 266 [61 Cal.Rptr. 510]; *People* v. *Beasley* (1967) 250 Cal.App.2d 71, 76-77 [58 Cal.Rptr. 485].) Just as a trial court, ruling on use of priors to impeach, "is in no position to make an informed determination prior to hearing the People's evidence" (*People* v. *Delgado* (1973) 32 Cal.App.3d 242, 252 [108 Cal.Rptr. 399]), here, where the People indicated an intent to offer evidence of prior criminal conduct to rebut appellant's diminished capacity defense by demonstrating his mental

capacity during prior crimes, the trial court could not make an informed decision at a time when it had heard none of the evidence.

Contrary to appellant's claim that the court had ruled this evidence was admissible, the court in fact properly declined to rule.[8]

Neither the record on appeal, nor the habeas corpus record supports a conclusion that defendant's counsel introduced the evidence of prior criminal conduct only because he believed that this was tactically preferable to having it come in on rebuttal or through cross-examination of defendant. The record on appeal is susceptible of a conclusion that the evidence was offered as part of the diminished capacity defense to show that the charged offenses like those in the past were the product of brain damage, and that counsel made a tactical decision not to oppose introduction by the People of evidence regarding his past criminal conduct. That inference is confirmed by counsel's declaration, submitted as evidence in the habeas corpus proceeding that he introduced evidence of defendant's past criminal conduct because he believed the evidence was relevant to the diminished capacity defense he intended to offer. Since there was no trial court ruling on admissibility of the priors and the record refutes the claim that defendant offered the evidence of his criminal history only out of necessity after doing all he could to prevent the error he now claims was anticipated, he is estopped to urge such error. (Cf. *Warner Constr. Corp.* v. *City of Los Angeles* (1970) 2 Cal.3d 285, 299-300, fn. 17 [85 Cal.Rptr. 444, 466 P.2d 996] [no waiver or estoppel if objection overruled and party introduced evidence to overcome case made by opponent].)

---

[8]The question arose after the prosecutor had presented the People's case-in-chief, during defendant's opening statement, when defense counsel indicated that he would present evidence of diminished capacity, and stated that defendant's mother would describe his childhood illnesses. Out of the presence of the jury the prosecutor objected that such evidence would not be relevant at the guilt phase. Defendant's counsel explained that his evidence would show that defendant had suffered two serious head injuries; had a "diagnosed condition of epilepsy"; had a history of extensive use of alcohol and drugs; and had been hospitalized in a mental institution. He explained that the childhood diseases may have caused a present mental defect.

The prosecutor, in response, stated that if evidence of accidents at age 16 were relevant, "I suppose [it] would be relevant for us to bring in the fact that defendant was charged with and convicted [of] about six crimes after that and was in and out of the federal prison system as well as the California Youth Authority and never found to be epileptic nor was he ever found to have been mentally insane or treated for insanity." In this context, which did not involve a present ruling on the admissibility of such evidence, the court stated only: "Unfortunately *that may be relevant if the evidence comes in* originally . . . ." (Italics added.) At the conclusion of the discussion in chambers, after overruling the People's objection to the nature of the argument, the judge expressed his intent to consider objections to specific items of evidence when offered: ". . . We'll do the best we can do and we'll rule as we need to with regard to the specific evidence."

Defendant's further argument that the court erroneously admitted evidence of an uncharged offense, i.e., his escape from custody in a halfway house, is also answered shortly. He failed to object when the prosecutor elicited this evidence during cross-examination of defendant. Although counsel states in his declaration that he has no recall of this evidence, this failure to object, too, is consistent with counsel's apparent tactical decision to bring or let in evidence of this type. The admission of the evidence was not, in any event, prejudicial.

### D. Lay-opinion Testimony

■■ ■■■■ Defendant also urges error in the admission, over his objection that the witnesses had not been qualified as experts, of testimony by Ron Hauser, a detective, who returned defendant to Merced from Arizona in 1978, and Charles Visher, a correctional officer, who was then the manager of the Merced County jail, that in their opinion defendant was not "strung out" when they observed him.[9]

Although lay opinion with regard to alcohol-induced intoxication and sobriety has been held to be admissible if "[r]ationally based on the perception of the witness" (Evid. Code, § 800, subd. (a); *People* v. *Garcia* (1972) 27 Cal.App.3d 639, 643 [104 Cal.Rptr. 69]; *In re Joseph G.* (1970) 7 Cal.App.3d 695, 703 [87 Cal.Rptr. 25]), the admissibility of opinion as to drug-induced intoxication appears never to have been considered by this court. Defendant offers no basis upon which to distinguish evidence of drug-induced intoxication, however, and the Court of Appeal has held that if sufficient foundation is laid, lay opinion testimony that a person is under the influence of narcotics is admissible. (*People* v. *Moore* (1945) 70 Cal.App.2d 158, 165 [160 P.2d 857]; see also *People* v. *Newberry* (1962) 204 Cal.App.2d 4, 9 [22 Cal.Rptr. 23] [point waived by failure to object, but "[i]t is doubtful whether testimony that a person is under the influence of a narcotic requires expert qualifications on the part of the witness"].)

*People* v. *Nunn* (1956) 46 Cal.2d 460, 466-467 [296 P.2d 813], on which defendant relies is not contrary. In that case we held that the court properly admitted opinion testimony of a police officer experienced in interviewing addicts on whether more addiction resulted from use of pain medication or from criminal association. We noted that the officer had qualified as an expert since he had knowledge of the causes of addiction not possessed by the average man. No issue was before the court with respect to lay opinion

---

[9] "Strung out" is defined variously as: "1: physically debilitated (as from long term drug addiction) 2: addicted to a drug 3: intoxicated or stupefied from drug use." (Webster's Ninth New Collegiate Dict. (1984) p. 1170.) This source notes the first known use of the term as circa 1959.

regarding drug intoxication or withdrawal, subjects with which the average man has some knowledge particularly as to the outward manifestations of these conditions. *People* v. *Cruz* (1968) 260 Cal.App.2d 55, 59 [66 Cal.Rptr. 772], on which defendant also relies, involved identification of narcotic substances, a very different subject.

Lay opinion testimony is admissible where no particular scientific knowledge is required, or as "a matter of practical necessity when the matters . . . observed are too complex or too subtle to enable [the witness] accurately to convey them to court or jury in any other manner." (*Manney* v. *Housing Authority* (1947) 79 Cal.App.2d 453, 459 [180 P.2d 69]; see also *People* v. *Ravey* (1954) 122 Cal.App.2d 699, 703 [265 P.2d 154]; *Eger* v. *May Department Stores* (1953) 120 Cal.App.2d 554, 558 [261 P.2d 281].) The manifestation of drug intoxication and withdrawal are no less subtle than those of alcohol intoxication, and, unfortunately may be sufficiently common today that lay persons are capable of recognizing them. The courts of several states have so concluded. (See collected cases in Annot. (1983) 21 A.L.R.4th 905.) Reasoning that a layman who had himself ingested LSD in the company of defendant and had observed its effects had special knowledge, the Wisconsin Supreme Court held that he could offer his opinion that tablets consumed by defendant were LSD. The witness's lack of scientific training went only to the weight of the evidence, not admissibility. (*State* v. *Johnson* (1972) 54 Wis.2d 561 [196 N.W.2d 717].) Relying on *Johnson,* the Appellate Court of Illinois, in *People* v. *Davis* (1972) 6 Ill.App.3d 622 [286 N.E.2d 8], held that with proper foundation the opinion testimony of a lay witness that defendant was under the influence of drugs would be admissible.

Here, however, no "opinion" was offered by the witnesses. The objection was to Detective Hauser's "lack of qualification as an expert" and to the imprecision of the term "strung out." This objection was made after a foundation had been laid by ascertaining that in his work he had encountered persons who were "strung out." Although the court overruled the objection and the court acknowledged that, "I don't know if we know what anybody knows by the term," the subsequent questions were directed to, and the testimony was about Detective Hauser's specific observations. He testified that he did not see defendant sick, nauseated, shaking or trembling or sweating excessively, and that defendant did not complain of pain or discomfort.

Charles Visher, the jail manager, testified that he, too, was familiar with the condition of inmates who were "strung out," and that he had not noticed anything that indicated to him that defendant was "strung out." In response to defendant's objection and motion to strike on grounds of lack of

qualification and foundation the court ruled that the witness should define the term as he understood it. Visher explained that the reference was to an inmate who reflected "lack of sleep, nervousness, generally not in control of himself" which he attributed to drug usage. This witness also testified that defendant had not complained to him of nausea, vomiting, pain or discomfort, and did not appear to be perspiring or sweating excessively.

Defendant acknowledges that these witnesses testified regarding their observations, but argues that admitting the testimony allowed the prosecutor to give his own definition to the term "strung out" using symptomatology of heroin withdrawal that lacked validity. Any misconception in this regard could and should have been brought out on cross-examination. It must be recalled, also, that the evidence of drug usage offered by defendant was not limited to heroin, but included a wide spectrum of drugs, many of which are considered addictive.[10] Defendant's own medical expert had testified about an interview with defendant in which, after defendant described the drugs he had been using, defendant implied that at the time the offenses were committed he was "strung out" on drugs. Inasmuch as this witness used that term twice during his testimony, and the rebuttal testimony to which defendant objected was by the next two witnesses, any issue with regard to the imprecision of the term, or prejudice from lack of definition appears to have been waived.

## 2. *Adequacy of Counsel*

Defendant next pursues the claim that he did not receive constitutionally adequate representation by counsel at the guilt phase of the trial. In further support of this claim he asserts that counsel failed to investigate the facts underlying defendant's diminished capacity defense by obtaining relevant records, and did not by means of a motion pursuant to section 987.9 seek public funds with which to retain an investigator, a psychiatrist, or a psychopharmacologist.[11] He claims also that counsel failed to seek suppression of his confession on grounds that it was obtained in violation of *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]; did not attempt to exclude the testimony of Tyson and Karen on grounds that they had been discovered through illegal police

[10] He testified that after returning to Corning in September 1978 he "started" using "speed and heroin and some barbiturates, valium and, . . . weed." He was also drinking, and used liquid morphine.

[11] Section 987.9 permits the trial court to grant funds to counsel for an indigent capital defendant for payment of the expense of necessary ancillary services. (See *Keenan* v. *Superior Court* (1982) 31 Cal.3d 424 [180 Cal.Rptr. 489, 640 P.2d 108].) The record confirms that defendant's appointed counsel was under contract as a public defender, and, inferentially, that defendant was indigent and qualified for such services.

procedures; and as noted earlier did not object to admission of evidence of defendant's criminal record.

 The omissions identified by defendant do not singly or together establish a basis for relief on the appellate record.[12] Therefore, this claim will be addressed in the context of defendant's identical claim in his habeas corpus application.

### A. *Failure to Investigate*

Defendant claims that although counsel had outlined a diminished capacity defense to be supported by evidence of head injuries suffered during two accidents, hospitalization in a mental institution, drug abuse, and diagnosis as an epileptic, he did not investigate the "factual underpinnings" of this defense. He asserts that defendant was examined only by the two physicians appointed to render opinions regarding defendant's competence to stand trial, sanity, and diminished capacity; that during pretrial motions counsel stated that there were medical records in addition to those "filed" by those experts that counsel wanted to obtain, and that none of these records was obtained.

The record on appeal does not establish, however, that defendant was not examined by any other expert, or that counsel failed to obtain relevant records, or that had either of these steps been taken evidence favorable to the defense would, or even might, have been made available. This claim must be considered only as one properly raised in the habeas corpus proceeding.

### B. *Failure to Suppress Confession*

Defendant was arrested in Arizona in the early morning hours of November 24, 1978, on teletyped all points bulletins regarding the warrants for his arrest sent by Merced officials. Arizona officers immediately notified the Merced County Sheriff's office and Deputy John Harris went to Kingman, Arizona, the same day, arriving between 10 p.m. and midnight. Harris interviewed defendant and taped his 20- to 25-minute statement describing the offenses. Before doing so he advised defendant of his rights pursuant to *Miranda* v. *Arizona, supra,* 384 U.S. 436. Defendant acknowledged his

---

[12]The scope of an appeal is, of course, limited to the record of the proceedings below. (§§ 1246, 1259; *People* v. *Szeto* (1981) 29 Cal.3d 20, 35 [171 Cal.Rptr. 652, 623 P.2d 213].) An appellant who claims to have been denied constitutionally adequate assistance of counsel and relies on evidence outside the record may seek relief on this basis through a collateral attack on the judgment by petition for writ of habeas corpus. (See *People* v. *Pope* (1979) 23 Cal.3d 412, 426 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].)

understanding of those rights and agreed to talk to Deputy Harris. Also present were Detective Hauser and two Mojave County officers. Harris had been told by one of those officers, Sergeant Burt, that prior to Harris's arrival "they" had taped an earlier conversation.

Defendant's trial counsel objected to admission of evidence of the taped statement made to Harris without proper foundation and evidence of voluntariness of the *Miranda* waiver, i.e., evidence that defendant was not suffering from lack of sleep, drug withdrawal or influence, and on grounds that the edited version (to which the court had listened) was not sufficiently clear.

After hearing the tape counsel withdrew the *Miranda* waiver objection. ■■■ Defendant now claims that counsel's failure to seek suppression of the confession on grounds that it was the product of an earlier interrogation conducted by Arizona officers without *Miranda* advice and waivers reflects incompetence. Again, the record on appeal does not support the predicate assumption. The testimony of Deputy Harris that an Arizona officer told Harris that an earlier conversation had been taped does not support defendant's theory that the interview with Harris was part of a "continuous interrogation process," that defendant was interrogated by the Arizona officers, or that if such interrogation took place there had been no *Miranda* advice and waivers. *Westover* v. *United States* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], in which a confession followed lengthy interrogations by officers of different jurisdictions is, contrary to defendant's claim, distinguishable in this regard.

Inasmuch as the record confirms that counsel was aware of the possible *Miranda*-based objection and interposed one such objection, there is no room for an inference that counsel was not aware of the applicable law.[13]

## C. *The Testimony of Tyson and Karen*

Defendant next argues that ineffective assistance is demonstrated by counsel's failure to seek suppression of the testimony of Tyson and Karen on grounds that it was the product of an unlawful search of the Tyson home conducted pursuant to Karen's coerced consent. Again, the record on appeal does not support the suggestion that a search occurred. ■■■ Equally important, however, is the rule that when a witness voluntarily appears in court his testimony is not subject to suppression on that basis. The appearance of a witness or the testimony of that witness must be the product or

---

[13] Counsel did seek to exclude the confession as the product of an unlawful arrest. His pretrial motion pursuant to section 1538.5 was based on the arrest without an Arizona warrant. Denial of that motion is not urged on appeal as error.

"fruit" of a Fourth Amendment violation before suppression is even arguably required. (See *United States* v. *Crews* (1980) 445 U.S. 463 [63 L.Ed.2d 537, 100 S.Ct. 1244]; *People* v. *Teresinski* (1982) 30 Cal.3d 822 [180 Cal.Rptr. 617, 640 P.2d 753].)[14] Neither the identity of Tyson as a perpetrator of the offenses, nor that of his wife Karen as a possible witness was ascertained as the result of any police misconduct.[15]

Karen telephoned a Stockton police officer from a telephone booth on Thursday, October 12, told the officer that she was with Tyson, and had talked him into surrendering on Friday. The affidavit in support of the complaint recites that Officers Harris and Hauser met with Karen at the Tyson home where she said she wanted to tell them everything. There is no support in this document or in Karen's testimony for defendant's claim that the officers' entry was nonconsensual, that a search of the home was conducted at this time, or that if such search was undertaken it was without Karen's consent.

Tyson testified that when he met secretly with Karen prior to surrendering she told him that police officers had searched the house and had said that she could be arrested and prosecuted for aiding, abetting, being an accessory after the fact and for receiving stolen property. She told him that

---

[14] In *Crews* it had been argued that the victim's testimony identifying the defendant had been procured through the exploitation of an unlawful arrest of defendant as a result of which his photograph was taken and subsequently identified by the witness. The court found the identification testimony too attenuated to be within the "fruit of the poisonous tree" doctrine. (*Wong Sun* v. *United States* (1963) 371 U.S. 471 [9 L.Ed.2d 441, 83 S.Ct. 407].) The court noted that the victim's identity was already known to police and her presence in court was not the product of police misconduct; her identification testimony was based on independent recollection; and the defendant was present in court to be identified. Thus none of these elements was a product of the unlawful arrest (445 U.S. at p. 471 [63 L.Ed.2d at p. 546]), and the ability to give accurate testimony was not affected by the arrest. (*Id.,* at p. 472 [63 L.Ed.2d at p. 546].)

Here even assuming there had been an unlawful search of the Tyson home which prompted Tyson's voluntary surrender and led to official knowledge that Karen was a witness, the reasoning of *Crews* precludes a conclusion that the voluntary appearance and testimony of either is evidence that came about by an exploitation of the primary illegality.

We found no basis for rejecting the *Crews* reasoning in interpreting article I, section 13 of the California Constitution in *People* v. *Teresinski, supra,* 30 Cal.3d 822, 835-836, while noting that the deterrent purpose of the exclusionary rule might require a different result on other facts. We acknowledged that this approach had been used in this state several years earlier in *Lockridge* v. *Superior Court* (1970) 3 Cal.3d 166 [89 Cal.Rptr. 731, 474 P.2d 683].

[15] The record confirms, in fact, that Tyson had been identified as a suspect as early as October 9 or 10, 1978, when he was named as such in the investigating officers' crime report, and that a warrant for his arrest had been issued on October 11. The record also confirms that Leo Macias, the uncle of Miguel and Salvador Vargas, who was one of the persons visiting the victims on October 8, had given officers a description and license number of the automobile purchased from Miguel by defendant, and that Nadine Padilla who also had been there had identified photos of defendant and Tyson as the persons who had been present on October 8 discussing the purchase.

these officers, Harris and Hauser, had promised protection for her and her children if he surrendered. Again, nothing in this testimony supports the assertion that a search was conducted without a warrant or consent, that Karen was threatened, or that either her cooperation or her testimony was involuntary. ▮▮▮ She testified that she had lied to the officers initially and that they told her that property in the home was stolen, but her statement that she was "scared" at this time is an insufficient basis upon which to conclude that the police conduct was improper[16] or that her cooperation was coerced.[17] Under the circumstances she had good reason to be "scared" apart from any conduct on the part of the police officers: she knew her husband had committed three murders and she had assisted him in escaping. The use of that term implies neither that police misconduct engendered the fear, nor that her cooperation was coerced.

Defendant's argument, based on this testimony, that an arguably meritorious basis existed for an attempt by counsel to exclude the testimony of Tyson and Karen is simply not supported by the record on appeal.

Petitioner offered no additional evidence to support this claim in the habeas corpus proceeding. Respondent, however, supplied documentary evidence to refute speculative allegations. A declaration by the deputy district attorney who prosecuted petitioner states that his notes reflect careful advice to petitioner regarding his *Miranda* rights from the time of his first arrest, and that petitioner never indicated any hesitancy about discussing what he had done with Arizona authorities, Merced authorities, Tyson and Karen, and petitioner's girlfriend. The prosecutor's review of the police reports made at the time of the arrest and statement of Karen do not support the contention by petitioner that an unlawful search of the Tyson home took place or that any improper threats were made to induce her statement and cooperation.

A second exhibit is an unofficial transcript of the November 28, 1978, interview of defendant by Arizona officers. The interview commenced at 4 a.m. and concluded at 4:17 a.m. Petitioner was advised at the outset of his right to remain silent and that anything he said could be used against him; that he had a right to consult with an attorney, to have one present while he was being questioned, and to have one appointed before questioning if he could not afford to hire one; and that he could exercise his rights at any

---

[16] Defendant does not argue that the statement Tyson and Karen attribute to the investigating officers was untrue, or that there was no probable cause to arrest Karen.

[17] Defendant escalates an "implied" threat to take Karen's children from her, a threat nowhere mentioned in the record, into an actual threat, and on that basis argues that her cooperation was involuntary.

time and decline to answer any questions or to make any statement. Petitioner stated that he understood this before making his statement.

The third exhibit is an excerpt from the reporter's transcript of the trial of Tyson, petitioner's crime partner, in which Tyson confirmed that he had decided to give himself up and contacted Karen who said that she did not want to run. He therefore instructed her to get in touch with a detective he had met in the sheriff's office in Stockton. Again, we find no basis upon which counsel might have made meritorious motions to exclude this evidence.

## D. *Evidence of Prior Convictions and Criminal Conduct*

As his final "example" of errors or omissions of counsel at the guilt phase, defendant directs our attention to the failure of counsel to object to admission for the purpose of impeachment of evidence of defendant's convictions for motorcycle theft, transportation of a motor vehicle across state lines, his arrest or conviction for assault with a deadly weapon, and his escape.

A settled statement was prepared and made part of the record pursuant to rule 36(b) of the California Rules of Court on motion of defendant. As executed by his trial counsel, the prosecutor and the trial judge, it recites: "7. A *Beagle* [*People* v. *Beagle* (1972) 6 Cal.3d 441 (99 Cal.Rptr. 313, 492 P.2d 1)] objection was not made, nor was the motion filed because of trial strategy on the part of Defendant's counsel." This recital, to which defendant objected as being not properly included, since it reflected counsel's thought process, rather than unreported matters occurring at trial, was made in apparent response to the declaration made by counsel on appeal in his motion for a settled statement that he believed that trial counsel had made a *Beagle* motion, but that: "If trial counsel did not make such a motion, defendant needs this information as part of his contention on appeal that he received ineffective assistance of counsel." The order of this court directed the superior court to prepare a settled statement of "any matters the court finds potentially useful on appeal." After a hearing on defendant's objections to the settled statement, the trial judge denied defendant's motion to strike that portion of the statement, reasoning that trial counsel and the prosecutor had the right to include the statement.

Defendant has not sought further correction of the record by application to this court. (Cal. Rules of Court, rule 12(b).) Therefore, although the recital regarding counsel's trial strategy may not reflect an unreported "oral proceeding" that may be settled under rule 36(b) (see *People* v. *Gzikowski* (1982) 32 Cal.3d 580, 584-585, fn. 2 [186 Cal.Rptr. 339, 651 P.2d 1145]), it

is now part of the record and we find no reason to ignore it. The recital both refutes the claim that the failure to object reflects incompetence and supports the conclusion reached above independent of this document, that the introduction by defendant of this evidence was not compelled by an erroneous ruling by the court that it would be admitted, but was introduced in furtherance of the defense strategy of showing that mental illness, defect, or disease, and drug intoxication reduced defendant's capacity to harbor the specific mental elements of the charged offenses.

Defendant argues that the strategy elected was not one which a reasonably competent attorney would choose. However, counsel here was representing a defendant who had not only admitted the offenses, but had described them in detail to the police. In addition, his accomplice was to testify against him. Defendant suggests no other strategy that was both more likely to protect him and " 'reasonably foreseeable as such before trial.' " (*People* v. *Pope, supra,* 23 Cal.3d 412, 424.)

The record on appeal does not warrant an inference, much less a conclusion, that trial counsel rendered constitutionally inadequate assistance in his representation of defendant at the guilt phase of the trial.

3. *Multiple-murder Special Circumstances*

Section 190.2, subdivision (c)(5) of the 1977 death penalty law created as a "special circumstance" authorizing the imposition of death or life without possibility of parole the fact that a "defendant has in this proceeding been convicted of more than one offense of murder of the first or second degree. . . ." The complaint charged six special circumstances under this provision, alleging with respect to each of the murder counts that defendant had also "been convicted" in the same proceeding of the murder of the other two murder victims.

■■■ Noting that at the pretrial preliminary hearing stage, the defendant literally had not been convicted of any offense of murder, defendant argues that he was unlawfully committed, without probable cause as to any of these special circumstances. He acknowledges that defendant did not move in the superior court to set aside the information on this ground (§ 995) and that this omission would normally constitute a waiver of any defects in the commitment. (§ 996.) He argues, however, that compliance with that requirement is excused because at that time the law did not appear to permit a challenge to special circumstances allegations on a section 995 motion (see *People* v. *Superior Court (Grilli)* (1978) 84 Cal.App.3d 506 [148 Cal.Rptr. 740] [sentence enhancement allegation does not state separate offense and

therefore may not be challenged on § 995 motion])[18] and that in any case failure to make the motion to strike is a further example of trial counsel's incompetence.

Defendant makes no attempt to demonstrate that as a result of the allegedly improper commitment on an information including these special circumstances he was denied a fair trial or suffered prejudice. (*People* v. *Pompa-Ortiz* (1980) 27 Cal.3d 519, 529 [165 Cal.Rptr. 851, 612 P.2d 941].) Nor does counsel's failure to make the motion demonstrate that defendant was denied a potentially meritorious defense or otherwise denied the caliber of representation to which he was entitled under the Sixth Amendment or article I, section 15 of the California Constitution.

We infer that defendant's theory of prejudice under either approach is that had these special circumstances been stricken they would not have been found true and thus would not have been bases for eligibility for the death penalty.[19] Even were we to expand the *Pompa-Ortiz* concept of prejudice at trial flowing from defects in the preliminary examination, or recognize omissions by counsel related to the conduct of the preliminary examination as a basis for reversal of a subsequent conviction on grounds of ineffective counsel (cf. *In re Hannie* (1970) 3 Cal.3d 520, 528 [90 Cal.Rptr. 742, 476 P.2d 110]) that relief would not be warranted here since a section 995 motion made on this ground would lack merit.

We do not dispute the logic of petitioner's argument that evidence that a defendant has been "convicted" in the same proceeding of another murder cannot be presented at the preliminary hearing on a complaint charging multiple murders and related special circumstances under section 190.2, subdivision (c)(5). It is clear, however, that the requirement that the defendant "has been convicted" of other murders in the same trial is a jurisdictional prerequisite to the conduct of the penalty trial authorized by former section 190.4. That finding cannot and need not be made until the defendant has been found guilty of the murders charged and one has been found to be

---

[18] *Ghent* v. *Superior Court* (1979) 90 Cal.App.3d 944 [153 Cal.Rptr. 720], decided after the December 13, 1978, preliminary examination in this case, distinguished *Grilli* and held that the sufficiency of evidence underlying special circumstances allegations may be tested on a section 995 motion. This court thereafter reached the same conclusion approving *Ghent* in *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131, 137 [197 Cal.Rptr. 79, 672 P.2d 862], and *Ramos* v. *Superior Court* (1982) 32 Cal.3d 26 [184 Cal.Rptr. 622, 648 P.2d 589].

[19] Unlike the situation of a defendant who must stand trial on counts charging a transactionally unrelated offense that might have been stricken on a section 995 motion, and who may suffer prejudice from the admission of evidence regarding the commission of that offense, here the evidence upon which the section 190.2, subdivision (c)(5), special circumstances were based was admissible regardless of the special circumstances charged. Thus defendant suffered no prejudice at the guilt phase of the trial.

of the first degree. It follows that the Legislature could not have intended that evidence sufficient to establish probable cause to believe the defendant had been "convicted" of those offenses be presented at the preliminary examination. To read the statute in the manner suggested by defendant would eliminate multiple murder as a special circumstance.

Both common sense and established rules of statutory construction preclude that interpretation. The language of section 190.2, subdivision (c)(5), is clear and unambiguous insofar as it applies at the trial.

The question is not, as defendant contends, one of statutory construction involving section 190.2, subdivision (c)(5), but rather the quantum of evidence necessary to establish reasonable or probable cause to believe that a defendant will be convicted of offenses which render him eligible for the death penalty under this special circumstance. The proper application of sections 872[20] and 995[21] is the question. The rule is well established. A defendant is "legally committed" within the meaning of section 995, insofar as the quantum of evidence is in issue, if "it appears from the [preliminary] examination that a public offense has been committed, and there is sufficient cause to believe the defendant guilty thereof." (§ 872 [now subd. (a)].) "The term 'sufficient cause' is generally equivalent to 'reasonable and probable cause,' that is, such a state of facts as would lead a man of ordinary caution or prudence to believe and conscientiously entertain a strong suspicion of the guilt of the accused." (*People* v. *Uhlemann* (1973) 9 Cal.3d 662, 667 [108 Cal.Rptr. 657, 511 P.2d 609].) When review is sought of a magistrate's order committing a defendant for trial, the superior court on a petition for writ of prohibition filed pursuant to section 999a, applies the same test recognizing that "[e]vidence that will justify a prosecution need not be sufficient to support a conviction. An information will not be set aside or a prosecution thereon prohibited if there is some rational ground for assuming the possibility that an offense has been committed and the accused is

---

[20] Section 872: "(a) If, however, it appears from the examination that a public offense has been committed, and there is sufficient cause to believe the defendant guilty thereof, the magistrate must make or indorse on the complaint an order, signed by him, to the following effect: 'It appearing to me that the offense in the within complaint mentioned (or any offense, according to the fact, stating generally the nature thereof), has been committed, and that there is sufficient cause to believe the within named A.B. guilty thereof, I order that he be held to answer to the same.' "

[21] Section 995:

"(a) Subject to subdivision (b) of Section 995a, the indictment or information shall be set aside by the court in which the defendant is arraigned, upon his or her motion, in either of the following cases: [¶] (1) If it is an indictment: [¶] (A) Where it is not found, endorsed, and presented as prescribed in this code. [¶] (B) That the defendant has been indicted without reasonable or probable cause. [¶] (2) If it is an information: [¶] (A) That before the filing thereof the defendant had not been legally committed by a magistrate. [¶] (B) That the defendant had been committed without reasonable or probable cause. [¶] (b) . . . ."

guilty of it. A reviewing court may not substitute its judgment as to the weight of the evidence for that of the magistrate, and every legitimate inference that may be drawn by the reviewing court from the evidence must be drawn in favor of the information." (*Caughlin* v. *Superior Court* (1971) 4 Cal.3d 461, 464-465 [93 Cal.Rptr. 587, 481 P.2d 211].)

The same standard is applied to test the sufficiency of the evidence to support the commitment on or inclusion in the information of a special circumstance (§ 739). (*Ghent* v. *Superior Court, supra,* 90 Cal.App.3d 944, 955.) Since many special circumstance allegations overlap the substantive offense or offenses charged, and a finding of probable cause as to the latter necessarily establishes probable cause as to the identical elements of the special circumstance, the magistrate and the reviewing courts need only identify the additional elements of the special circumstances and satisfy themselves that sufficient evidence has been presented to establish the probable existence of those additional elements.

In the context of section 190.2, subdivision (c)(5), a court cannot literally find probable cause to believe that a defendant as yet untried has been convicted. The logical application of sections 872 and 995 to this special circumstance is not as obscure as defendant suggests, however. For the special circumstance to be found true at trial, the defendant must be found guilty of at least two counts of murder, and the count or counts to which the special circumstance allegations are appended must be of the first degree. The additional elements which would justify a verdict of first degree murder as to which probable cause must be shown are set forth in section 189. If that evidence is sufficient the magistrate may find probable cause to believe the defendant "committed" first degree murder, and based upon that, he "may be" convicted of that offense. It is not necessary at this pretrial stage that the magistrate find probable cause to believe the defendant "has been" convicted. (See also *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1148-1149 [240 Cal.Rptr. 585, 742 P.2d 1306], rejecting a similar claim under the 1978 law.)

Defendant makes no claim that probable cause as to these elements was not established in accordance with these standards. The commitment for trial on this special circumstance was not therefore vulnerable to challenge by a section 995 motion, and counsel cannot be deemed incompetent for failing to make such motion on the ground suggested.

4. *Failure to Separately Charge Crimes Included as Elements of Other Special Circumstances*

Defendant was also charged with two allegations of the special circumstance, defined in former section 190.2, subdivision (c)(3)(i) (murder

in the course of robbery) and one each of section 190.2, subdivision (c)(3)(ii) (murder in the course of kidnapping) and section 190.2, subdivision (c)(3)(iii) (murder in the course of rape). All but the last were found true.

Former section 190.4 provided that "[w]henever a special circumstance requires proof of the commission or attempted commission of a crime, such crime shall be charged and proved pursuant to the general law applying to the trial and conviction of the crime." Defendant was not, however, charged with, nor were separate verdicts returned on the offenses underlying the special circumstances—robbery (§ 211), kidnapping (§ 207), or rape (§ 261, subd. (2)). This court held in both *People* v. *Robertson, supra,* 33 Cal.3d 21, and *People* v. *Velasquez* (1980) 26 Cal.3d 425 [162 Cal.Rptr. 306, 606 P.2d 341], that an omission to separately charge the underlying offenses was error, but was not prejudicial. We reasoned that notice was afforded by the special circumstance allegation.

Defendant asks the court to reconsider this conclusion, arguing that the purpose of the requirement that the underlying crime be "proved pursuant to the general law applying to the trial and conviction of crime" was to ensure the accuracy and reliability of the verdict. The only support offered for the assumption that the reliability of the verdict would be enhanced is that the attention of the jury would then be properly focused on the "quantum of evidence as to each element of that crime." He notes also the possibility that the jury might return a not guilty verdict as to the crime which could then be asserted as inconsistent with a finding that the related special circumstance was true.

As defendant correctly points out, subsequent to *Valasquez* we stated in both *People* v. *Green, supra,* 27 Cal.3d 1, 59, and *People* v. *Thompson, supra,* 27 Cal.3d 303, 322, quoting *Green,* that a valid conviction of the underlying crime is a "necessary condition" to finding a related special circumstance allegation true. That statement was made in an entirely different context, however, and does not preclude upholding a special circumstance when the notice given by the charge was adequate, the instructions given to the jury required that all of the elements of the underlying crime be found to exist, and the jury was correctly instructed that the defendant's guilt of that crime must be proven beyond a reasonable doubt. In those circumstances the jury's attention is focused directly on the crime and it is proven according to the general law. The return of only a special circumstances verdict confirming the jury's finding that the defendant was guilty of the crime is a defect in form not substance.[22] The instructions on these matters given the

---

[22] We recognize that the omission of the charge and verdict on the substantive underlying crime results in there being no "conviction" on which a separate sentence may be imposed,

jury in this case were adequate in all respects.[23] No demonstrable prejudice to defendant resulted from the failure to charge him with the additional crimes of robbery, kidnapping and rape.

### 5. Redundant Multiple-murder Special Circumstances

■■■ Defendant next claims that section 190.2, subdivision (3) of the 1977 death penalty law must be construed to permit charging only a single multiple-murder special circumstance in a single prosecution. While acknowledging the propriety of consideration of the multiple killings as an aggravating factor, he argues that the proliferation of special circumstances based thereon skewed the jury verdict in favor of death. Since a single multiple-murder special-circumstance finding is sufficient to render a defendant eligible for the death penalty, defendant argues that only one should be charged to avoid arbitrary imposition of death at the penalty phase. This court so held in *People* v. *Allen* (1986) 42 Cal.3d 1222, 1273 [232 Cal.Rptr. 849, 729 P.2d 115]. (See also, *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 788 [230 Cal.Rptr. 667, 726 P.2d 113]; *People* v. *Harris* (1984) 36 Cal.3d 36, 67 [201 Cal.Rptr. 782, 679 P.2d 433] (plur. opn. of Broussard, J.).) Any error in charging more than one multiple-murder special circumstance is harmless at the guilt phase, however. It is in the penalty selection that the cumulative findings may have prejudicial impact.

### 6. The Kidnapping Special Circumstance

■■■ Defendant, relying on *People* v. *Green, supra,* 27 Cal.3d 1, challenges the finding that he committed the murder of Lourdes Meza during the commission of a kidnapping, the special circumstance described in section 190.2, subdivision (a)(17)(ii). In *Green* this court considered the meaning of the special circumstance element that a murder be committed "during the commission of" the related offense and concluded that where the defendant's intent is to kill, and the related offense is only incidental to the murder, the murder cannot be said to have been committed in the commission of the related offense. To construe the special circumstance otherwise would be inconsistent with the legislative purpose underlying all special circumstances—that of distinguishing between those murderers who deserve consideration for possible imposition of the death penalty from

---

and should the murder verdict be set aside, the defendant may not be held or punished for the lesser offense. A defendant is in no position to claim prejudice in that regard, however.

[23] The court instructed that the special circumstances must be proved beyond a reasonable doubt; instructed on willful, deliberate and intentional killing in the course of the underlying offense; instructed on the elements of each underlying offense; and instructed on the applicability of diminished capacity to the specific-intent elements of murder and the underlying offenses. Defendant claims no error in this regard.

those who do not. *Green* held therefore that the special circumstance of killing during the commission of one of the felonies enumerated in section 190.2, subdivision (a)(17), existed only if the killing was to advance the independent felonious purpose. (27 Cal.3d at p. 61.)

This trial took place prior to our decision in *Green*. The trial court was not aware of this construction of the kidnapping special circumstance and thus did not instruct the jury in accordance with that decision.[24] Defendant argues that this omission requires that the special circumstance be set aside because he has been denied the right to have the jury determine a material issue. (*People* v. *Modesto* (1963) 59 Cal.2d 722, 730 [31 Cal.Rptr. 225, 382 P.2d 33].) This, he contends constitutes a per se miscarriage of justice within the meaning of article VI, section 13, of the California Constitution as applied in *Modesto* and *People* v. *St. Martin* (1970) 1 Cal.3d 524, 532 [83 Cal.Rptr. 166, 463 P.2d 390].)

We disagree. Assuming that such an instruction would have been required in this case, the omission could not have prejudiced defendant. The evidence that defendant's purpose in kidnapping Lourdes Meza was not simply to kill is more than sufficient. It is overwhelming. In such circumstances the failure of a felony-murder special-circumstance instruction to fully conform to *Green* is not prejudicial and the omission does not require reversal. (See *People* v. *Murtishaw* (1981) 29 Cal.3d 733, 742 [175 Cal.Rptr. 738, 631 P.2d 446]. Cf. *People* v. *Croy* (1986) 41 Cal.3d 1, 14 [221 Cal.Rptr. 592, 710 P.2d 392].)

---

[24] The court instructed the jury that in order to find the kidnapping special circumstance true "each of the following facts must be proved.

"One, that the murder was willful, deliberate and premeditated, and two, that defendant was personally present during the commission of the act or acts causing death, and three, that defendant, with intent to cause death, physically aided or committed the act or acts causing death, and four, that the murder was committed during the commission or attempted commission of a kidnapping.

"Kidnapping is unlawfully compelling another person against his will and without his consent and because of a reasonable apprehension of harm to move for a substantial distance where such movement is not merely incidental to the commission of the crime of robbery or rape and where such movement substantially increases the risk of harm to such person over and above that necessarily inherent in the commission of the crime or crimes of robbery or rape.

"It is a defense to a charge of kidnapping that the defendant entertained a reasonable and good faith belief that the person alleged to have been kidnapped voluntarily consented to accompany the defendant and to the movement involved in the alleged kidnapping.

"If from all the evidence you have a reasonable doubt whether the defendant reasonably and in good faith believed that the person alleged to have been kidnapped voluntarily consented to accompany the defendant and to the said movement, you must give the defendant the benefit of that doubt and find that the special circumstance kidnapping charge in the tenth paragraph not true."

The evidence of defendant's purpose in kidnapping Lourdes Meza leaves no room for a contrary conclusion. Appellant and Tyson had already killed the only other occupants of the farmhouse when Lourdes Meza was kidnapped. Appellant conceded that he intended to kill her also. He had no reason to take her from the house other than to prolong her life for the purpose of the sexual assault. He already had possession of her wallet, so the kidnapping was not for the purpose of robbery and there is no suggestion that it might have been for any reason other than to flee the immediate scene to avoid discovery while accomplishing the sexual assault. Thus, unlike *Green, supra,* 27 Cal.3d 1, where the robbery was an opportunistic crime committed incidentally during the murder, here the inescapable conclusion is that the kidnapping had an independent, rather than incidental purpose. The jury did not find the rape special circumstance (§ 190.2, subd. (a)(17)(iii)) true, but that determination is not dispositive since the jury had only to find whether or not the murder occurred during the commission or attempted commission of rape, not whether the kidnapping had a felonious sexual assault in addition to murder, as a purpose.

The jury found that appellant kidnapped Lourdes Meza. It did so on the basis of evidence so strong that no rational jury could have found that he did not have a felonious purpose other than his ultimate goal of killing her. Upon review of the entire record we can say with confidence that the omission of an instruction that an independent felonious purpose is an element of the kidnapping special circumstance was harmless beyond a reasonable doubt since no rational jury could have failed to find that a purpose other than and in addition to killing her precipitated the kidnapping.

There being no error prejudicial to the defendant at the guilt phase of the trial, the conviction of defendant on the three counts of first degree murder is affirmed. The verdicts finding the six special circumstances allegations based on multiple murder true are modified to reflect a single multiple-murder special circumstance. The remaining special circumstance verdicts are affirmed.

SANITY PHASE

1. *Instructions*

At the trial on defendant's plea of not guilty by reason of insanity (§§ 1016, subd. 6, 1017, 1026) he presented evidence in the form of the reports of two court-appointed psychiatrists and an electroencephalogram (EEG)

test, which counsel both read to the jury and lodged as exhibits.[25] Neither psychiatrist had concluded the defendant was insane. The electroencephalo-gram was normal.[26] Before this evidence was presented the prosecutor, in his opening statement, explained to the jury that the court would instruct on the concept of legal insanity and the finding would be "dependent upon whether you find for [sic] mental illness or mental defect, the defendant lacked a substantial capacity to either appreciate the wrongfulness of his conduct or the criminality of his conduct or whether or not the defendant was able to conform his conduct to the requirements of the law."

The court instructed the jury, after first explaining that mental illness or abnormality was not necessarily the same as legal insanity: "A person is legally insane if, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." ▮ The court also instructed, however: "*A person whose brain has become diseased or damaged by the use of intoxicating liquor, drugs or narcotics so as to render him incapable of knowing or understanding that his act was wrong, is legally insane.*" Other instructions informed the jury that temporary legal insanity was fully recognized and that irresistible impulse was "not legal insanity unless as a result of mental disease or mental defect a person lacked sub-stantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law."

---

[25] The parties had stipulated to presentation of the evidence in this manner. Defendant's counsel stated for "the record" that this strategy had been discussed with defendant and they "were proceeding in this fashion with his consent and permission." He also asserted that it was his "belief this is the best interest of my client to proceed in this fashion."

Defendant personally affirmed his desire to follow this procedure.

[26] The report of Max Brannan, M.D., stated: "There is no evidence that he has any frank mental illness or that he is insane or that he was insane at the time of the alleged incident . . . in my opinion he was legally sane at the time of the alleged incident and he is legally sane at the present time . . . he did not have a mental disease or defect that would cause him to lack substantial capacity either to appreciate the criminality (wrongfulness) of his conduct or to conform his conduct to the requirements of the law. . . .

There is no evidence that he has ever been insane. . . . [H]e is sane at the present time . . . he remains a danger to the health and safety of others, himself included . . . because . . . he is sociopathic . . . not because of mental illness but because of personality disorder relating to impulsiveness and acting without thinking."

The report of Richard A. LLoyd, M.D., stated: ". . . the defendant was legally sane at the time of the alleged offense . . . he did not have a mental disease or defect which caused him to lack substantial capacity either to appreciate the criminality, wrongfulness, of his conduct or to conform his conduct to the requirements of the law . . . the defendant probably does have a personality disorder."

Each physician had noted defendant's statement regarding his consumption of alcohol and drugs in reaching his conclusions. Each had reviewed the EEG report subsequent to making his report and had stated that his opinion was not changed.

Elwood W. Hopkins, M.D., who had administered the EEG reported: "Impression, nor-mal awake EEG."

Defendant argues that the court's instruction regarding drug-induced brain damage, noted above in italics, erroneously stated the M'Naghten definition of legal insanity rather than the "substantial capacity" definition adopted in *People* v. *Drew* (1978) 22 Cal.3d 333 [149 Cal.Rptr. 275, 583 P.2d 1318], which was correctly stated in the remaining instructions. The correct instruction, he suggests, was that derived from *Drew* and *People* v. *Kelly* (1973) 10 Cal.3d 565 [111 Cal.Rptr. 171, 516 P.2d 875]: "A person is legally insane, if, as a result of mental disease or mental defect, either temporary or permanent, caused by the long continued use of (alcohol) (drugs) (narcotics) even after the effects of recent use of (alcohol) (drugs) (narcotics) have worn off, he lacks substantial capacity to either appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. [¶] Legal insanity must be settled insanity and not merely a temporary mental condition produced by recent use of (alcohol) (drugs) (narcotics)." (CALJIC No. 4.02 (1978 rev.).)

The People concede, and we agree, that the court erred in giving the instruction in M'Naghten language. The error, however, was harmless.

In *Drew* this court noted that in the absence of a statutory definition of insanity many courts in this country had adopted that of the common law courts of England enunciated in M'Naghten's Case (1843) 10 Clark & Fin. 200, 210 [8 Eng.Rep. 718, 722], that a person was legally insane if "at the time of the committing of the act, the party accused was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing what was wrong." We concluded that this test was inadequate in its failure to encompass mental illness which did not affect cognitive abilities to this degree, but did render a person incapable of conducting him or herself in accordance with the standards he or she knew to be required by law. We therefore adopted the definition of legal insanity recommended by the American Law Institute, or the "ALI test"—" 'A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law.' " (*People* v. *Drew, supra*, 22 Cal.3d 333, 345.)[27] That definition of insanity encompassed mental defect or illness regardless of etiology and thus applied to drug-induced mental defect or illness.

We are confident that the error did not prejudice defendant in the circumstances of this case. The proper definition was twice included in the

---

[27] A statutory definition reinstating the M'Naghten test has since been adopted, supplanting the *Drew*/ALI definition. (§ 25, subd. (b); *People* v. *Skinner* (1985) 39 Cal.3d 765 [217 Cal.Rptr. 685, 704 P.2d 752].)

court's instructions, and had been explained in the prosecutor's opening statement. The instruction on drug-induced insanity was supplemental to the basic instruction defining insanity under which the jury was to find defendant insane at the time of the offenses if he either lacked capacity to understand that his conduct was criminal or lacked capacity to control his conduct. If the jury understood the instructions to be conflicting, the inconsistency was only as to the second prong of the *Drew*/ALI definition. Thus the jury could have understood the rule to be that if it found mental defect or illness caused by drugs (including alcohol) legal insanity existed only if defendant did not know his conduct was wrong. If he did know this, it was not relevant that the drug-induced mental defect or illness rendered him incapable of conforming conduct.

There is no direct evidence in the record of mental defect or illness; no direct evidence that defendant did not or could not appreciate the wrongfulness of his conduct; and no direct evidence that as a result of mental defect or illness defendant was unable to control his conduct. All of the expert evidence offered by defendant was that defendant was legally sane under the *Drew*/ALI test. In addition, the jury had rejected the evidence of diminished capacity offered by defendant at the guilt phase of the trial, returning verdicts which by necessary implication reflect findings that defendant did not suffer from mental defect or illness of a type that destroyed his ability to harbor malice, i.e., to understand the law's proscription of acts highly dangerous to human life, and his obligation to conform his conduct to that law (see *People* v. *Cruz* (1980) 26 Cal.3d 233, 244 [162 Cal.Rptr. 1, 605 P.2d 830]; *People* v. *Conley, supra,* 64 Cal.2d 310, 324), or any other mental element of the charged offenses.

The only question is whether, notwithstanding this cognitive ability, but for the erroneous instruction, the jury might have concluded that defendant suffered from a drug-induced mental defect or illness as a result of which he lacked the capacity to refrain from committing three intentional, premeditated, and deliberate murders. The only theory on which this conclusion might have been reached is that defendant's pattern of criminal conduct, one which commenced prior to his heavy drug use, was circumstantial evidence of mental defect or illness caused by that use.[28] We find this reason-

---

[28] Although defendant argues that the "essence" of his insanity defense was his longstanding use of alcohol and drugs, this theory was not articulated to the jury. None of the three examining physicians found brain damage of any sort, and the two psychiatrists who opined on the question found neither mental defect nor mental illness from any cause. In his argument to the jury counsel for defendant asked only that the jury make its own decision as to sanity in light of defendant's history, how he explained the past incidents to the doctors, and "What you know about the case, . . . drug usage and . . . his physical condition . . . ." In closing he expressed his own opinion that defendant was sociopathic, stating this was "important in

ing far too speculative to warrant a conclusion that the error was prejudicial. In the absence of any evidence deserving of consideration that as a result of mental defect or illness defendant lacked substantial capacity to control his actions the error did not prejudice defendant and there was no miscarriage of justice. (Cal. Const., art. VI, § 13; *People* v. *Cruz, supra,* 26 Cal.3d 233, 251-252.)

## 2. *Adequacy of Counsel*

■ Appellant claims, as he did with respect to counsel's preparation for trial of the guilt phase, that counsel "wholly failed" to investigate the factual underpinnings of the defense, basing this assertion only on the failure of the record to reflect investigative activity. He notes that the record includes no motion for appointment of an independent psychiatrist or psychologist to aid the defense (see Evid. Code, § 730; *People* v. *Lines* (1975) 13 Cal.3d 500, 507 [119 Cal.Rptr. 225, 531 P.2d 793]) and none for the appointment of other experts or with which to obtain the medical records relevant to defendant's earlier hospitalization in a mental health facility. As evidence of incompetency of counsel, the failure of the record to reflect such indicia of investigative effort has no more probative value in this context than it did with regard to counsel's representation at the guilt phase. It establishes neither an actual failure to investigate nor a basis for concluding that evidence supportive of the insanity plea was available and was not offered as a result of counsel's failure to discover it. A factual basis, not speculation, must be established before reversal of a judgment may be had on grounds of ineffective assistance of counsel. (*Strickland* v. *Washington* (1984) 466 U.S. 668, 690 [80 L.Ed.2d 674, 695, 104 S.Ct. 2052]; *People* v. *Pope, supra,* 23 Cal.3d 412, 425; *People* v. *Stephenson, supra,* 10 Cal.3d 652, 661.)

■ Defendant next argues that the failure to object to the appointment of the same psychiatrists to determine his competency to stand trial (§ 1368) and sanity at the time of the offense (§ 1026) constituted ineffective assistance. He does not suggest that there existed any doubt with respect to his competence to stand trial. Neither defense counsel nor the prosecutor had requested a competency examination, and the court had not indicated that a doubt existed as is required by section 1368, when the examination is undertaken because of a doubt as to a defendant's present mental competence.

The record reflects an order by the judge that the psychiatrists examine defendant and report on his sanity at the time of the offenses, his present

---

the light of the court's instructions, impulsive acts without thinking and could commit the same offense again towards others or himself. In fact he says it himself."

"sanity," and whether at the time of the offenses he suffered from diminished capacity to form the specific intent to kill, to deliberate, to premeditate, to harbor malice, and to meaningfully and maturely reflect upon the gravity of his contemplated acts. There is no indication in the record of the reason for the order apart from the entry of the insanity plea. Arguing that counsel should have objected to this procedure, defendant notes that incriminating statements made during a competency examination have been subject to exclusion under a judicially created immunity (see *Tarantino* v. *Superior Court* (1975) 48 Cal.App.3d 465, 469-470 [122 Cal.Rptr. 61]) whereas statements made to psychiatrists appointed under section 1026 are admissible at the guilt phase if a defendant places his mental state in issue and thereby waives his privilege against self-incrimination to that extent. (*People* v. *Arcega* (1982) 32 Cal.3d 504, 521 [186 Cal.Rptr. 94, 651 P.2d 338]; *In re Spencer* (1965) 63 Cal.2d 400, 412 [46 Cal.Rptr. 753, 406 P.2d 33].)

Again, the failure to object is an insufficient basis from which to infer that counsel rendered ineffective assistance. Defendant points to no statements made to these experts and admitted at trial that might have been excluded had the subject of competency to stand trial not been included in the order. Inasmuch as sanity at the time of the offenses was in issue, and a diminished capacity defense was anticipated, it was apparent to all that the psychiatrists would probe extensively into both the circumstances of the offenses and defendant's social and mental history, and that the testimony or reports would be admissible at the guilt phase. Since nothing that defendant might reveal about his commission of the offenses that was relevant to present competency would be irrelevant on the issue of diminished capacity, there was no reason to object, and since competency to stand trial had not been questioned, there was no purpose for a request for appointment of different psychiatrists to opine on that subject.

Defendant also questions counsel's tactical decision to read into the record the psychiatrists' reports which concluded that he was sane and supported a conclusion that he was guilty of the charged offenses. As noted above, there is no question but that this was a tactical decision in the making of which defendant participated.[29] He expressed his understanding

---

[29] Many of the statements made to the psychiatrists which defendant now says were harmful and should not have been laid before the jury are those which might have supported a conclusion that some undiagnosed mental illness or defect accounted for defendant's homicidal conduct. These included his statements that when drinking, "I get into another frame of mind. It's hard for me to relate to that frame of mind now, a lot of it I don't remember. I don't understand my actions." In reference to the day of these killings he said: "I think it was something that was building up in me. Prior to that, I had almost killed three people in an armed robbery. The night before, I had almost killed my old lady. I was just pretty crazy." He also said: "It's like looking at me as a different person, like looking at a side of me I don't

of and agreement to the procedure. Defendant's statements to the psychiatrists regarding his history were consistent with the evidence already admitted at the guilt phase. The alternative procedure would have been to withdraw the insanity plea. It is not possible to conclude on the appellate record that counsel's tactical decision not to do so was one beyond the range of tactical decisions that competent criminal defense attorneys would make. (*People* v. *Pope, supra,* 23 Cal.3d 412, 424.)

Defendant's statements to the psychiatrists were relevant to defendant's strategy of attempting to convince the jury that the psychiatrists were wrong, and that he did, in fact, suffer from mental illness or defect amounting to legal insanity. Defendant's claim on appeal that counsel should have sought a limiting instruction is patently meritless. Had counsel sought an instruction that the statements could be considered only to show the information upon which the psychiatrists' opinions that he was sane were based, he could not have asked the jury to consider the statements as evidence of legal insanity, an issue on which he bore the burden of proof by a preponderance of evidence. (*People* v. *Drew, supra,* 22 Cal.3d 333, 348-349.)

Finally, defendant claims that counsel's incompetence is demonstrated by his failure to object to the erroneous instruction on drug-induced insanity in which the M'Naghten rather than the *Drew*/ALI test (see *ante,* pp. 930-931) was used to define legal insanity. We have concluded above that any error in this regard was not prejudicial. Therefore, counsel's failure to object to the erroneous instruction does not afford a basis for reversal on grounds of ineffective counsel. (Cf. *People* v. *Nation* (1980) 26 Cal.3d 169 [161 Cal.Rptr. 299, 604 P.2d 1051].)

There being no prejudicial error during the trial on defendant's plea of not guilty by reason of insanity, and insufficient evidence to support the claim of constitutionally ineffective counsel at this phase of the trial, the verdict finding that defendant was sane at the time of the commission of the offenses is affirmed.

### THE HABEAS CORPUS PROCEEDING

Defendant's petition for writ of habeas corpus is based on his claim, also made on appeal and briefly discussed above, that trial counsel failed to afford constitutionally adequate representation in defending him against these charges. We found no basis for reversal in the several aspects of counsel's conduct considered earlier in this opinion. Because the major

---

understand. This trip's been happening for a long time. . . . I don't think I'm crazy, but something is not right when you just shoot three people for the fuck of it because you're pissed off."

thrust of the claim that counsel failed to afford an adequate defense lies in the alleged failure of counsel to investigate, and to obtain and offer evidence supportive of the diminished capacity defense which was presented, omissions which allegedly affected the guilt, sanity, and penalty phases of the trial, it is appropriate to consider the habeas corpus petition at this juncture.

Under the procedures governing petitions for writs of habeas corpus, the petition in this case might have been summarily denied for failure to state a prima facie case entitling petitioner to relief on grounds of incompetent counsel. Although petitioner alleged that counsel failed to adequately investigate and adequately present his diminished capacity defense, he failed to allege facts demonstrating that: (1) based on facts that counsel knew or should have known competent counsel would have undertaken further investigation; or (2) such investigation would have produced additional evidence that might have affected the verdicts; or (3) counsel's omissions otherwise resulted in prejudice.

The court nonetheless issued an order to show cause.[30] We did so for two reasons—because this is a capital case in which we did not wish to risk the possibility that petitioner had failed to make his allegations sufficiently complete because he was unaware of the proper habeas corpus procedures, and because he may have been led by language in *In re Saunders* (1970) 2 Cal.3d 1033, 1043 [88 Cal.Rptr. 633, 472 P.2d 921], to believe that alleging failure to investigate alone establishes a right to relief. The order to show cause having issued, however, petitioner now bears the burden of establishing his right to relief. (See *People* v. *Frierson* (1979) 25 Cal.3d 142, 160 [158 Cal.Rptr. 281, 599 P.2d 587].)

■ When the basis for the petition is the failure of counsel to afford the quality of representation guaranteed by article I, section 16 of the California Constitution, the petitioner must not only prove that counsel inexcusably failed to make particular investigations or objections, or failed to introduce particular items of evidence, but must also demonstrate that the omissions resulted in the denial of or inadequate presentation of a potentially meritorious defense. (*People* v. *Fosselman* (1983) 33 Cal.3d 572, 583-584 [189 Cal.Rptr. 855, 659 P.2d 1144].) It must also appear that the omission or omissions were not attributable to a tactical decision which a reasonably competent, experienced criminal defense attorney would make. (*People* v. *Frierson, supra,* 25 Cal.3d 142, 158.) This showing demonstrates that "trial counsel failed to act in a manner to be expected of reasonably competent

---

[30] Normally, the issuance of an order to show cause is "an implicit preliminary determination that the petitioner has made a sufficient prima facie statement of specific facts which, if established, entitle him to habeas corpus relief under existing law." (*In re Hochberg* (1970) 2 Cal.3d 870, 875, fn. 4 [87 Cal.Rptr. 681, 471 P.2d 1].)

attorneys acting as diligent advocates." (*People* v. *Pope, supra,* 23 Cal.3d 412, 425.)

Thus, to be entitled to reversal of a judgment on grounds that counsel did not provide constitutionally adequate assistance, the petitioner must carry his burden of proving prejudice as a "demonstrable reality," not simply speculation as to the effect of the errors or omissions of counsel. (*People* v. *Stephenson* (1974) 10 Cal.3d 652, 661 [111 Cal.Rptr. 556, 517 P.2d 820].) Errorless counsel is not required, moreover. (*In re Saunders, supra,* 2 Cal.3d 1033, 1041.) ■■■ The petitioner must demonstrate that counsel knew or should have known that further investigation was necessary, and must establish the nature and relevance of the evidence that counsel failed to present or discover. If that evidence relates to a diminished capacity defense, the failure to discover or present the evidence will be considered prejudicial only if it might have caused a reasonable jury to conclude that the defendant actually lacked the mental capacity that constituted an element of the charged offense. (See *People* v. *Robertson, supra,* 33 Cal.3d 21, 43-44.)

■■■ The standards by which competence of counsel is measured under the Sixth and Fourteenth Amendments, to which we have referred earlier in this opinion, parallel those applied under article I, section 16. Except in cases in which the circumstances give rise to a presumption of ineffectiveness because it is "so unlikely that any lawyer could provide effective assistance," as when insufficient time to investigate and prepare has been allowed (*United States* v. *Cronic* (1984) 466 U.S. 648, 661 [80 L.Ed.2d 657, 669, 104 S.Ct. 2039]) actual prejudice must be shown. The defendant must demonstrate either that counsel's conduct of the trial brought about a breakdown of the adversarial process justifying a "presumption that [the] conviction was insufficiently reliable to satisfy the Constitution" (*id.* at p. 662 [80 L.Ed.2d at p. 670]), or that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. (*Strickland* v. *Washington, supra,* 466 U.S. 668, 694 [80 L.Ed.2d at p. 698].) "A court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." (*Id.* at p. 696 [80 L.Ed.2d at p. 699].)

1. *The Petition*

Petitioner claims specifically that counsel was aware of, but failed to obtain medical and psychiatric records that would have supported and corroborated the diminished capacity and insanity defenses; that being un-

aware that funds for that purpose were available under section 987.9 counsel had failed to obtain the services of an investigator or independent experts to assist in developing the defense; that counsel had failed to consult medical and psychiatric experts before entry of the plea of not guilty by reason of insanity; and that counsel had failed to investigate penalty-phase evidence.

He also claims that counsel had failed to call as witnesses at the penalty phase petitioner's mother and sisters who would have offered mitigating evidence.

The petition is accompanied by several exhibits, among them the medical records that had not been obtained by counsel; a declaration of trial counsel; declarations by three attorneys whose practice includes criminal defense who offer their opinions that trial counsel had not afforded the quality of representation to be expected of competent criminal defense attorneys; and a declaration by a psychiatrist who, based on his review of the medical and psychiatric reports and materials supplied by appellate counsel, opines that had the medical and psychiatric records been available at trial and to the examining psychiatrists a stronger defense could have been presented.

2. *The Return*

In the return respondent asserts that the judgment is valid, and that petitioner has not demonstrated that he was denied constitutionally adequate assistance by his trial counsel. Respondent concedes that in some respects counsel's performance fell below that expected of reasonably competent defense attorneys, but argues that counsel's omissions did not prejudice petitioner in that it is not reasonably probable that a more favorable result would have followed absent counsel's omissions.

In particular respondent noted the absence of any evidence that psychiatric experts exist who would have offered testimony more favorable to petitioner on the question of his mental capacity at the time of the offense and points out that the records which petitioner claims counsel should have obtained would not have supported the theory of diminished capacity pursued at trial, or any other theory of diminished capacity that would have been consistent with the evidence presented.

3. *The Traverse*

The traverse repeats the claims made in the petition upon which petitioner bases his assertion that he was denied effective assistance of counsel at trial, and incorporates by reference the petition and exhibits accompanying it. Additional exhibits accompany the traverse.

Among the exhibits which accompany the petition for writ of habeas corpus are: a. Medical records from Clairemont Community Hospital in San Diego. Petitioner was admitted to that facility as an emergency patient on May 20, 1976.

b. Medical records from the Federal Correctional Institution at Terminal Island. Petitioner was a patient in that facility in February 1977.

c. A declaration by petitioner's trial counsel in which he states: (1) He had not obtained the services of a defense investigator, law clerk, second attorney, or independent experts for petitioner's trial. He made no formal motion to obtain funds for these purposes and was unaware of section 987.9. Had he been aware of that provision he would have sought funds under it. He did make two informal inquiries prior to trial about funds for defense purposes, and discussed the availability of funds in chambers with the trial judge. He had also discussed funds with the administrator of the investigatory budget for contract attorneys. He understood from both that no funds were available.

(2) The diminished capacity and insanity defenses were based primarily on petitioner's long history of alcohol and drug abuse. Counsel had been advised by petitioner's mother of his San Diego hospitalization for psychiatric reasons. Both court-appointed psychiatrists made reference to the possibility of such hospitalization, and both mentioned that records of the hospitalization might exist. Counsel had also been advised by petitioner's mother that petitioner had been seen by psychiatrists on a number of occasions while incarcerated in federal prison. Counsel did not obtain any medical or psychiatric records, although petitioner's mother stated that she would inquire about the San Diego hospitalization. Neither she nor counsel mentioned the matter again. Counsel did not discuss obtaining the records with petitioner.[31]

---

[31] The declaration also stated that the only persons interviewed by counsel in connection with the case were petitioner, petitioner's mother and aunt, and the two court-appointed psychiatrists. He did not interview prosecution witnesses, but had available the transcript of the earlier trial of Tyson, which he believed covered the same factual issues and made interviews with prosecution witnesses unnecessary. The interviews with the court-appointed psychiatrists were for the purpose of determining the accuracy of the reports and whether their testimony would be consistent with the reports. The not guilty by reason of insanity plea had been entered for the purpose of obtaining the services of the psychiatrists and thereby information relevant to the diminished capacity defense. Counsel at no time believed that petitioner was legally insane. His purpose in letting that plea stand was to preserve for appeal a claim of error in denying his motion for separate juries for the three phases of the trial. He expected the sanity phase of the trial to be very brief. He read the reports into the record instead of calling the psychiatrists because he believed the testimony would be duplicative of the testimony given by one at trial. Reading the report would also save time and money. Petitioner, to whom

(3) Counsel called no witnesses at the penalty trial although he had considered calling the aunt. The aunt had attended some early trial hearings, but had stopped coming to court. Counsel had been advised that the aunt was ill, and that she did not know petitioner well. Petitioner's mother had been called at the guilt phase and her testimony would have been duplicative. Neither petitioner nor his mother suggested anyone else who could testify, although counsel did inquire of them.

d. A declaration and supplemental declaration of Joseph Satten, M.D., a board-certified psychiatrist who has qualified as an expert and has both examined and testified regarding the mental condition of criminal defendants on many occasions. Based on his review of the reports of the psychiatrists who examined petitioner in advance of trial, and the medical records from Clairemont Hospital and the Federal Medical Institution, and his understanding that a diminished capacity defense was presented at trial, Dr. Satten opined in his declaration that the medical records could have helped present a significantly stronger defense. The records would verify statements of petitioner that otherwise appeared to be self-serving; would lead to additional areas of inquiry; and create some sympathy for defendant because they reveal his attempt to deal constructively with the psychiatric symptoms linked to the crime.

Dr. Satten, who at that time had not examined defendant, offered his analysis and conclusions regarding petitioner's mental state at the time of the offenses. His "Presumptive Diagnosis" was "intermittent explosive disorder (DSM-III 312.32); rule out Epilepsy" and "Substance Abuse, alcohol and heroin (DSM-III 305.0X, 305.5X)."

Dr. Satten, in his accompanying discussion, states that petitioner's description of his mental state "suggests a dissociative process and the possibility of an Intermittent Explosive Disorder," and that a change in an

counsel had explained the proposed procedure, agreed, saying "essentially, 'you're the lawyer.'"

Had counsel been aware of the *Spencer* decision, *supra,* 63 Cal.2d 400, he would not have attached much importance to it. He did not expect to prevail at the sanity phase and did not attach much importance to the psychiatrists' reports. He intended to allow the jury to make of them what it would. He did not consider excising irrelevant or prejudicial matter from the reports, or moving to limit the use of the reports or statements therein by petitioner.

Counsel had discussed with petitioner the decision that petitioner would testify. He did not make a motion pursuant to *People* v. *Beagle, supra,* 6 Cal.3d 441, to prevent impeachment of petitioner with evidence of his prior convictions. He believed the priors would be admissible for impeachment purposes and decided to bring them out on direct to limit their potential impact *and* because he believed they were relevant to the diminished capacity defense inasmuch as the offenses had occurred during or following a period of drug or alcohol abuse by petitioner. Counsel has no recall of the prosecutor eliciting testimony from petitioner about an uncharged escape, and believes that such evidence was irrelevant and inadmissible.

individual's state of consciousness generally manifested by some degree of amnesia usually accompanies the violent outburst. He believes that the evidence shows that petitioner's offense took place during an episode of "at least partial dissociation," and that petitioner did not have the capacity to form the mental states necessary to first degree murder, that he could not form the intent to kill, or meaningfully premeditate, deliberate, or harbor malice. He also believes that it is possible that during this period petitioner met the then applicable legal test of insanity in that he could not conform his conduct to the requirements of the law.

e. Also accompanying the traverse as an exhibit was a declaration of Dr. David E. Smith, who is both a physician and pharmacologist and has extensive experience in treating substance abusers and in teaching, consulting, and testifying as an expert in this field. His review of the materials led him to believe that petitioner suffered from the disease of alcoholism, and that an adequate diagnosis of petitioner's mental condition could not be made without a more complete history than that obtained for petitioner at the time of trial.

Dr. Smith concludes that the examining psychiatrists were not familiar with the disease of alcoholism and had they been they would not have concluded that petitioner was able to form the intent to kill, to premeditate, harbor malice, or meaningfully and maturely reflect on the gravity of his actions. He concludes that petitioner was suffering from acute alcohol intoxication, which in an individual suffering from alcoholism often leads to "gray-outs" or "black-outs" and diminished mental capacity.

Dr. Smith also asserts that the view of the examining psychiatrist that an intoxicated person could not perform complex physical tasks such as driving or running up and down stairs indicates the psychiatrist's unfamiliarity with alcoholism, and is "medically incorrect." Persons with petitioner's history, he states, "when intoxicated with alcohol, manifest pathological intoxication with a marked personality change and become hyperactive, aggressive and assaultive. It is also possible that these personality changes and assaultive behaviors will be accompanied by a marked memory impairment."

He also explains that when a person has a "grayout" or "blackout" there is a loss of primary memory while secondary memory is retained. Petitioner described this symptom to the examining psychiatrist when he said that it was as though he were "watching a movie that had lots of breaks in it, black spots." Dr. Smith declares that when a person loses primary memory but has secondary memory he is able to reconstruct events through the secondary memory and is able to piece together the events he cannot actually

recall. Although Dr. Smith had not then examined defendant he believed that at the time of the offense petitioner could not harbor the specific mental states that are elements of first degree murder.

Because neither expert had reviewed defendant's two confessions, and neither had examined or interviewed him prior to offering his opinion regarding defendant's mental capacity, the court granted permission to file additional declarations by Dr. Satten and Dr. Smith.

In his original declaration Dr. Satten had stated that he was of the opinion that defendant's offenses occurred during an episode of "at least partial dissociation," and that defendant did not have the capacity to form the mental state necessary to first degree murder, that he could not form the intent to kill, or meaningfully premeditate, deliberate, or harbor malice. He also believed that during this period defendant met the then applicable legal test of insanity in that he could not conform his conduct to the requirements of the law. After his review of defendant's confessions, and a one-and-one-half-hour interview of defendant, Dr. Satten declared that his opinion and the diagnosis which he had reached previously were unchanged, "particularly . . . with regard to the death of the two male victims. While there is more evidence of petitioner's ability to form the mental states necessary to constitute first degree murder with respect to the female victim it is still my opinion, after a review of all the material in this case and a personal interview with petitioner, that he could not meaningfully form the requisite mental states to constitute first degree murder because he was still significantly in a dissociative state and also under the influence of drugs and/or alcohol at the time of this killing." Dr. Satten would testify to this opinion were he called as a witness.

In his postexamination declaration Dr. Smith stated that it was apparent to him during the examination of defendant that defendant was on medication and still has "substantial residual neuropsychic impairment." He believes that at the time of the offenses defendant was suffering a psychotic episode, that he was chemically dependent on drugs and alcohol as a result of which his behavior was directed at the single goal of obtaining those substances, and that in his compulsive behavior defendant ingested drugs and alcohol triggering "toxic psychosis." Any interruption of the goal-oriented activity would produce a "rage reaction." The greater the intoxication, the greater the reaction, until a complete break with reality occurs. In his opinion defendant was in a toxic psychotic state at the time of the killings. One indication of such a psychotic episode, in the opinion of Dr. Smith, was defendant's loss of primary memory of the events, which Dr. Smith believed was evident in the trial testimony by defendant and during his examination of defendant. Dr. Smith declared that in his opinion de-

fendant could not form the intent to kill, premeditate, deliberate, harbor malice, or meaningfully and maturely reflect on the gravity of his actions. He would testify to this effect if called as a witness.

## 4. *Disposition*

A comparison of the factual allegations of the petition and traverse with those of the return satisfies us that there are no disputed factual matters requiring resolution. A reference is not necessary. (*People* v. *Frierson, supra,* 25 Cal.3d 142, 160; *In re Lawler* (1979) 23 Cal.3d 190, 194 [151 Cal.Rptr. 833, 588 P.2d 1257].)

Based on the exhibits and declarations summarized above, defendant contends that he has met his burden on habeas corpus of showing that counsel was on notice that a potentially meritorious defense might be available, that counsel failed to investigate that defense, and that as a result of counsel's failure he was denied that defense at trial. He argues that counsel's failure to investigate resulted in the complete withdrawal of several potentially meritorious defenses and deprived counsel of an informed basis upon which to make choices concerning the presentation of "any" defense at trial. In these circumstances, it is claimed, prejudice must be presumed and the judgment set aside. The alternative would be to compel the court to speculate on the effect of counsel's omissions.

The rule espoused by defendant is appropriate in cases in which defense counsel wholly fails to investigate a potentially meritorious defense of which he is or should be aware, and as a result the defense is withdrawn or counsel is incapable of making an informed tactical decision with respect to whether the defense should be offered. (See *People* v. *Shaw* (1984) 35 Cal.3d 535 [198 Cal.Rptr. 788, 674 P.2d 759]; *People* v. *Mozingo* (1983) 34 Cal.3d 926 [196 Cal.Rptr. 212, 671 P.2d 363]; *In re Saunders, supra,* 2 Cal.3d 1033.) In *People* v. *Frierson, supra,* 25 Cal.3d 142, defendant's counsel presented what this court described as an "undeveloped theory of diminished capacity," by offering evidence that on the day of a capital murder the defendant had ingested mind-altering drugs. Counsel had not consulted any experts or had the defendant examined to explore a diminished capacity defense, and offered no experts to assist the jury in understanding the potential impact of the drugs on the defendant's mental capacity. In those circumstances we concluded that it was unnecessary to consider the possible impact of counsel's omissions on the outcome of the trial. We cautioned, however, that we were not holding that counsel must seek psychiatric or expert advice in every case in which drug intoxication was a "possible" defense, but when it appeared to be the sole potentially meritorious defense in a capital case, and counsel elected to present it, "counsel must be expected to take those rea-

sonable measures to investigate the factual framework underlying the defense preliminary to the exercise of an informed choice among the available tactical options, if any. In the present case, we need not speculate as to the likely prejudicial effect of counsel's omissions, for counsel's failure to take reasonable investigative measures actually resulted in the presentation to the jury of an incomplete, undeveloped diminished capacity defense." (25 Cal.3d at p. 164.)

This case is not *Frierson,* however. Here counsel concededly failed to obtain a medical record which one expert subsequently concluded reflected a prior incident of violence which could have been precipitated by the mental condition which the expert has concluded existed at the time of the offenses charged here. This is not a case in which counsel failed to investigate defendant's mental condition, however. To the contrary, although unaware of the availability of funds under section 987.9 to engage experts, counsel did have defendant enter an insanity plea, and thereby brought about the appointment of two psychiatrists who examined defendant and offered their opinions not only on his sanity at the time of the offense, but also on whether his capacity was so diminished that he was unable to or did not harbor the mental states which are elements of the charged offenses. Although defendant states that counsel did not engage "independent" experts, those who were appointed were neutral, court-appointed experts. In these circumstances, it cannot be said that counsel failed to investigate the diminished capacity defense which he did present. The problem is that the investigation, so far as it went, failed to produce evidence supportive of the defense. The rule of *Frierson, supra,* 25 Cal.3d 142, therefore, is not dispositive.

■■■ Defendant proceeds on the assumption that having identified counsel's omissions he has established ineffective assistance in the preparation and presentation of his defense. Before such a conclusion may be reached here, where counsel did investigate and obtain the services of experts in evaluating defendant's mental state, we must consider: (1) whether, having the opinions of two experts that defendant was not legally insane and did not suffer from diminished capacity, counsel was under a duty to seek additional opinions; and, if so (2) whether his failure to do so prejudiced the defense. This analysis is required whether counsel's performance is to be measured under the guarantee of counsel found in article I, section 15 of the California Constitution, or under the Sixth and Fourteenth Amendments to the United States Constitution. ■■■ Under the former, we stated the rule in *People* v. *Fosselman, supra,* 33 Cal.3d 572, 584: "[I]n cases in which a claim of ineffective assistance of counsel is based on acts or omissions not amounting to withdrawal of a defense, a defendant may prove such ineffectiveness if he establishes that his counsel failed to perform with

reasonable competence and that it is reasonably probable a determination more favorable to the defendant would have resulted in the absence of counsel's failings. (*Pope, supra,* 23 Cal.3d at p. 425; *People* v. *Watson, supra,* 46 Cal.2d at p. 836.)" Under the Sixth Amendment standard the defendant must establish either that there was a breakdown of the adversarial process such as to warrant a presumption that the conviction is insufficiently reliable to satisfy the Constitution (*United States* v. *Cronic, supra,* 466 U.S. 648, 662 [80 L.Ed.2d 657, 670]), or that counsel's omissions were likely to have affected the outcome of the trial. (*Strickland* v. *Washington, supra,* 466 U.S. 668, 696 [80 L.Ed.2d 674, 699].)

■■■ Addressing the first question, we conclude that counsel's failure to seek the advice of "independent" experts may not be characterized as constitutionally inadequate assistance. Defendant has offered declarations by attorneys engaged in the representation of criminal defendants in whose opinion defense counsel should have sought appointment of a psychiatrist to advise him prior to entry of the not guilty by reason of insanity plea on whether to enter that plea, and should have obtained the advice of a psychopharmacologist. They opine that failure to do so in this case was "inexcusable." But defendant has not demonstrated that the experts by whom he was examined were not qualified or that counsel had reason to believe they were not qualified to determine whether defendant's mental capacity was diminished at the time of the offenses. His present experts have concluded that, because the appointed psychiatric experts did not arrive at the same diagnosis as they did, the appointed experts are unfamiliar with alcoholism and drug dependence. We cannot accept the opinion of one expert that because another has reached a contrary conclusion with respect to a diagnosis the other is unqualified. Defendant himself does not so argue.[32]

Defendant's attorney did that which we held in *Frierson, supra,* 25 Cal.3d 142, was required. He made "reasonable efforts to investigate the factual framework underlying the defense" of diminished capacity in an attempt to obtain additional evidence in the form of expert opinion to bolster the defense. Competent representation does not demand that counsel seek repetitive examinations of the defendant until an expert is found who will offer a supportive opinion. Defendant's claim here is not unlike that made in

---

[32] The record reveals that Dr. Max Brannan, one of the appointed psychiatric experts who examined defendant, was a graduate of the Tulane University Medical School. He had a rotating internship, followed by a residency at Folsom State Prison. He practiced general medicine until 1958 when he returned to school for a four-year residency in psychiatry. He had been specializing in that field since 1962, and was in a continuing education program at the University of California at Davis at the time of trial. He had testified frequently as an expert, on behalf of both defendants and the prosecution.

Neither report by the court-appointed psychiatrists was accompanied by a curriculum vitae detailing their qualifications.

*In re Grissom* (1978) 85 Cal.App.3d 840 [150 Cal.Rptr. 96], where the court admonished that defense lawyers are not expected to practice the legal equivalent of defensive medicine by ordering multiple tests in the hope that one will produce useful information, "tests they forego at peril of being branded incompetent." (*Id.*, at p. 849.) As we observed in *People* v. *Stanworth* (1974) 11 Cal.3d 588, 613 [114 Cal.Rptr. 250, 522 P.2d 1058]: "[c]ounsel did undertake an inquiry to determine the mental capacity of defendant and . . . found no evidence of diminished capacity. Defendant's ability to produce conflicting evidence four years later does not in itself establish that the factual inquiry was inadequate. The proper test is whether the original inquiry by counsel was adequate in the light of facts he knew or should have known at the time the inquiry was undertaken."

Even were we to conclude that counsel should have sought another opinion or opinions, it does not appear reasonably probable that a more favorable determination would have been reached but for counsel's failure to locate the two experts who now state that they believe defendant was unable to form the intent to kill, or to deliberate, premeditate, or harbor malice, and was in a dissociative state at the time of the offenses. None of these mental states was a necessary element at the guilt phase where it seems clear that the verdicts of first degree murder were based on a felony-murder theory. Defendant's own testimony established both that he intended to steal, and that the killings took place in the perpetration of robbery. Neither the declaration of Dr. Satten nor that of Dr. Smith suggests that defendant was incapable of having or did not have the intent to steal when he went to the home of Miguel, Salvador, and Lourdes or that this intent did not exist at the time he robbed and killed them.

The questions to be addressed in applying this standard of prejudice are: does this record now demonstrate that if counsel had obtained the records from Clairemont Hospital and the Federal Correctional Institution and made them available to the experts who examined petitioner, or had he obtained the services of "independent" or more knowledgeable experts, the diminished capacity defense would have been significantly stronger? Might the medical records have affected the jury's determination of whether petitioner lacked the mental states which are elements of first degree murder at the time of the homicides? Might the records have convinced an expert that he lacked these mental states and thus enabled counsel to offer evidence on the question in the form of expert opinion?

In the opinion of Dr. Satten the records which trial counsel did not obtain, and which the examining experts therefore did not consider, would have supported a conclusion that petitioner suffered from grayouts or blackouts at the time of the offenses. In the opinion of Dr. Smith the examining

experts should have recognized that petitioner suffered from alcoholism which brought about these conditions, and could not harbor the requisite mental states. Thus each declarant believed that the additional evidence might have persuaded the jury that petitioner did not intend to kill the victims, had not premeditated or deliberated the killings, and did not harbor malice when he shot the victims.

Considered in light of the entire record it does not appear reasonably probable that these opinions or the records of defendant's earlier hospitalization would have affected the verdicts at the guilt and sanity phases of the trial. Defendant's statement to California officers, and his trial testimony demonstrated his recall of many details of the events leading to the murders of at least two of the victims. He admitted preplanning most of those events. The jury heard one of these confessions, as well as the testimony of petitioner and that of Tyson and Karen. The jury therefore heard direct evidence of preplanning activity by petitioner, and of his detailed recall of the events. The opinions of the declarants offer only circumstantial evidence of inability to harbor the requisite mental states.

The declaration of Dr. Satten does not relate the diagnosis of explosive disorder and its accompanying "partial dissociation" to the evidence that petitioner had good recall of the events and had preplanned them.[33]

---

[33] In his own testimony petitioner exhibited good recall of the events leading up to and those subsequent to the killing of Salvador and Miguel Vargas. It seems inconceivable that this could be the product of the "secondary memory" described by Dr. Smith. After detailing the various drugs and alcohol ingested on the day prior to the murders, petitioner testified about the trip to the murder scene, stating that "we went through Lockford after we left Galt . . . and we picked up a six-pack in Lockford. And then we went into another little town outside of Oakland—not Oakland, Oakdale. Then we picked up another six-pack there. And then we shot on into Merced. We drove around a little bit, stopped in some places and then we went to the bar. And we had two, two beers there." He also recalled the number of Valium tablets he took en route to the scene, and described the activity after leaving with the third victim, Lourdes Meza, in the car. "We stopped at a Kwik Shop or 7-Eleven Store to get gas. And first Bob was going to get out and get some beer. And, like I said, the chick made a lunge towards either the door or something and I backhanded her, slapped her or something. Bob knocked her back in the seat. I told Bob to get back in the car and I went into the bar— or into the store and got a six pack of beer."

Petitioner also described the events immediately preceding the killing of Salvador and Miguel, when he and Robert Tyson had briefly left the Vargas house and Tyson told him that Salvador was in the house. Petitioner explained that when they reentered "Bob's supposed to have—when we go in the house, whoever was downstairs, Bob's supposed to watch them on the floor and watch them. Now he's got a gun. And the gun was loaded . . . . And I was to go upstairs and check out this other Mexican male. I didn't know if he had a gun." After they had entered and petitioner had gone to the second floor he saw "Lourdes was coming out of the bathroom. And this other Mexican male was coming out of this bedroom . . . . I told him 'down.' I kept trying to tell him to get down . . . he didn't understand what I was saying . . . they put their hands up . . . Salvador then, the male got down to the floor at some time . . . . I hollered for Bob to come up to bring the other Mexican male upstairs. And Bob led

It is also noteworthy that both experts considered only defendant's mental state at the time of the offenses, notwithstanding the substantial evidence that the crimes were preplanned. ■■■ It is well established that where such intent has been formed and continues to control a defendant's actions in committing an offense, his intoxication while committing the crime does not negate the intent element of the offense. (See *People v. Hough* (1944) 24 Cal.2d 535, 542 [150 P.2d 444]; *People v. Coleman* (1942) 20 Cal.2d 399, 410 [126 P.2d 349].) ■■■ Finally, the medical records themselves do not support the defense of diminished capacity that was presented on the basis of defendant's past drug and/or alcohol intoxication. They do not confirm the belief of petitioner's mother that petitioner suffered from epilepsy, or mental defect as the result of a head injury except to the extent that they incorporate petitioner's statement of that history and indicate that while in the Federal Correctional Institution petitioner had taken Dilantin. No diagnosis of epilepsy or brain damage was made, and the Clairemont report found that petitioner's psychiatric problems were inconsistent with a seizure disorder, noting that his violent episodes were precipitated by anger and were directed in character rather than being the product of disordered cerebral electric activity.[34]

---

the other Mexican male upstairs or he didn't lead him, he—Mexican male was in front of him. He had the gun on him, brought him upstairs . . . . Bob started hollering something in Mexican. That's when Miguel went down and the other Mexican male went down on his hands and knees."

John Harris, a Merced County detective, interviewed petitioner after petitioner's arrest in Arizona. He testified that petitioner had confessed to him that he had killed the three victims and that he and Tyson had discussed the matter before arriving in Merced, and that he, petitioner, had pulled the trigger on all three. Petitioner told Harris that he and Tyson had located the victims' residence, talked with the victims for a short while, left, and then after deciding what each was to do, petitioner went upstairs, while Tyson stayed downstairs. Petitioner told Harris that he had located a male and a female upstairs, and told Tyson to bring the male upstairs. He placed him on the floor, shot him in the head and they took the female with them. Tyson left the house holding the female by the hair. They purchased beer in a town outside of Modesto, and drove to Tuolumne, and had intercourse with the female. In Tuolomne County petitioner took the female from the car in some hills and shot her in the head four times. Petitioner told Harris that he had shot each of the male Mexicans two times, and after killing the female he thought about killing Tyson because he was "sniveling." They then drove back to Tyson's residence where petitioner picked up the two females and left. A tape of petitioner's statement to Harris was played to the jury and admitted in evidence.

[34] The first of these exhibits, the Clairemont General Hospital (San Diego) "Admitting Form" which indicates that petitioner was admitted on May 20, 1976, as a psychiatric patient with an admitting diagnosis of "Bable Schizophrenic Effective Psychosis," and a final diagnosis of "Explosive Personality and Affective disorder (depression)." He was discharged on May 20, 1976, with a notation "improved."

This document is accompanied by a "Discharge Summary," as well as detailed reports regarding the initial examination and impression. A physician's "impression" dictated on May 21, 1976, was that petitioner suffered from an undiagnosed psychiatric disorder, was an ex-hyperactive child with a history of sociopathy, and "might well have primary affective disorder, although explosive personality and epileptiform, or a temporal epilepsy seizures cannot be ruled out."

In the light of these shortcomings we cannot say that had any or all of this evidence been presented it might have affected the verdicts. The petition therefore must be denied insofar as it seeks to invalidate the convictions and the findings on sanity. We consider below the relevance of the additional evidence to the penalty decision and whether counsel's failure to obtain and present it may have affected that decision.

### PENALTY-PHASE ERROR

Defendant challenges the penalty-phase proceedings that led to the imposition of the judgment of death on several grounds. We conclude that although the jury erroneously considered the three murders as six special circumstances, and counsel inexcusably pursued the insanity plea, thereby again putting before the jury defendant's threat to kill again if released from prison, neither requires reversal of the judgment of death. We also conclude that none of defendant's other arguments has merit.

The jury was instructed under standard penalty-phase instructions,[35] that it should consider any special circumstances it had found true as factors

---

The report of a neurological consultation by a different physician dictated on May 25, 1976, recited the history given by petitioner of blackouts, often preceded by heavy drinking, and explosive outbursts, but concluded that the neurologic examination, EEGs, skull series, and brain scan were normal, and that the history was inconsistent with a diagnosis of seizure disorder. "The episodes are virtually always precipitated by anger and are directed in character indicating that they are not due to disordered cerebral electric activity." This physician concluded that treatment was primarily psychiatric.

Copies of laboratory, occupational therapy, and other reports also accompany these Clairemont Hospital reports. They include one reporting a normal brain scan, normal EEG, normal skull X-ray, and normal electrocardiogram.

The second set of exhibits is from the Federal Correctional Institution at Terminal Island where petitioner was hospitalized for lumbosacral sprain, on January 16, 1978. On discharge, while in convalescent status he complained that the medication given him was ineffective. These records include an April 12, 1977, consultation request which recites that petitioner "had seizure [accompanied by] contusions" and had not been taking his Dilantin; and a consultation report that petitioner was, as of April 25, 1977, taking his Dilantin, and complained of double vision. On admission to the Federal Correctional Institution, petitioner completed a medical history on which he reported that he had been treated for "blackouts" in San Diego, had been hospitalized for a head injury, had been rejected for military service for "mental reasons," and had suffered frontal headaches. A clinical history notes petitioner's report of a head injury in 1968 in a motorcycle accident, and another in 1977 while at the Federal Correctional Institution, and a concussion in 1973 from a bomb explosion which resulted in partial loss of hearing in one ear, "no sequela."

[35] This instruction (CALJIC No. 8.88.1), given in the language of former section 190.3, directed the jury to consider the following factors, if applicable:

"A. The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true.

"B. The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the expressed or implied threat to use force or violence.

relevant to the appropriate penalty. The jury found the six charged multiple-murder special circumstances true. ■ Presumably, these special circumstances were considered as factors relevant to the penalty determination. No purpose of the state is served in the consideration of more than one multiple-murder special circumstance inasmuch as the culpability factor which this special circumstance finding reflects is that the defendant has committed more than one murder. This factor is present regardless of the number of murders in excess of the one of which the defendant is convicted. Although the jury may properly consider that number as an aggravating factor, when multiple murder is identified as a special circumstance the potential impact may be greater. First, as a special circumstance, multiple murder is singled out as a factor which the state identifies as having particular relevance to the penalty decision. In addition, and of potentially greater significance, the multiple-murder special-circumstance findings could have an unwarranted impact on the jury's selection of the appropriate penalty *if* the jury is influenced by the sheer number of special circumstances which in some cases increase in geometric proportion to the number of victims. Thus, consideration of more than one multiple-murder special circumstance serves neither the legislative purpose of identifying those murderers whose crimes make them eligible for the death penalty, nor the overriding constitutionally mandated purpose of channelling or focusing the discretion of the jury so as to avoid arbitrary and capricious imposition of the death penalty. (See *Pulley* v. *Harris* (1984) 465 U.S. 37, 53 [79 L.Ed.2d 29, 42, 104 S.Ct. 871]; *California* v. *Ramos* (1983) 463 U.S. 992, 999 [77 L.Ed.2d 1171, 1179, 103 S.Ct. 3446].)

Therefore, failure to instruct the jury at the penalty phase to consider only one multiple-murder special circumstance was also error. We see no

"C. Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.

"D. Whether or not the victim was a participant in the defendant's homicidal conduct or consented to the homicidal act.

"E. Whether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct.

"F. Whether or not the defendant acted under extreme duress or under the substantial domination of another person.

"G. Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or the effects of intoxication.

"H. The age of the defendant at the time of the crime.

"I. Whether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor.

"J. Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime."

The jury was also instructed: "You must not consider as to aggravation any evidence of criminal activity by defendant which did not involve the use or attempted use of force or violence or which did not involve the expressed or implied threat to use force or violence."

possibility that this error affected the verdict. (*People* v. *Allen, supra,* 42 Cal.3d 1222, 1281.) The impact, if any, of the error was inconsequential and cannot reasonably be characterized as a constitutional defect in the sentencing process. (*Zant* v. *Stephens* (1983) 462 U.S. 862, 888-889 [77 L.Ed.2d 235, 257, 103 S.Ct. 2733]; see also *Barclay* v. *Florida* (1983) 463 U.S. 939, 957 [77 L.Ed.2d 1134, 1148-1149, 103 S.Ct. 3418].)

The error here resulted from the instruction to the jury that it should consider each of the special circumstances it had found true as an aggravating factor. Because the jury had found six multiple-murder special-circumstance allegations true, when there should have been only a single special circumstance, the instruction could, theoretically, have led the jury to base its assessment of defendant's culpability on the sheer number of special circumstances rather than on the underlying conduct. After consideration of the entire record in this case, we conclude that the possibility that the jury may have based its penalty decision, even in part, on the sheer number of special circumstances it had found true, rather than on defendant's conduct, is far too remote and speculative to suggest that the jury would have reached a different verdict had it considered the murders as a single special circumstance. Review of the record here reveals no reference by the prosecutor to the multiple-murder special circumstances during his penalty-phase argument. The jurors were well aware of the actual number of victims and their consideration of multiple murder as an aggravating factor which the state identifies as being particularly relevant to the penalty decision was permissible. Only were we to assume that the jury for some reason believed that the murders were more heinous because they generated six multiple-murder special-circumstance allegations through the cross-charging would the failure to limit the multiple-murder factor to a single special circumstance result in prejudice. Nothing in the manner in which this case was tried, or in the penalty phase argument and instructions, affords a basis on which to speculate that the jury may have been influenced by the number of multiple-murder special circumstances. We conclude, as we did in *People* v. *Allen, supra,* 42 Cal.3d 1222, 1281-1283, that the error was harmless.

We must also consider whether this error in combination with the impact of defense counsel's conduct of the sanity and penalty phases of the trial affected the penalty decision. ▆ Counsel presented no evidence in mitigation at the penalty phase of the trial.[36] At the trial on defendant's plea of not guilty by reason of insanity, which immediately preceded the penalty trial, however, counsel introduced the evaluation of one appointed psychiatrist even though both experts had concluded that defendant was sane. His

---

[36] He had however presented evidence of defendant's troubled youth, hospitalizations, and possible mental defect, the mitigating evidence on which he relied, during the guilt phase.

decision to do so rather than withdraw the plea put before the jury evidence of a potentially prejudicial nature. The only explanation for this decision offered by counsel was that he wanted to preserve for appeal his claim of error in the denial of a separate jury to hear the sanity phase testimony, and that he decided to let the jurors make what they would of the opinion.

In the circumstances of this case, this decision was not one that competent counsel would make for tactical reasons. There is no present authority for the proposition that a defendant is entitled to a separate jury at the sanity-phase of a trial. Even accepting that an attorney might make a motion for a separate jury in order to lay a foundation for an appellate argument seeking to have such a right recognized, in this case there was no evidence that defendant was insane. Counsel's explanation that he wanted to preserve the claim of error for appeal, and therefore proceeded with the sanity phase rather than withdrawing the plea of not guilty by reason of insanity, ignores the impact this lack of evidence would have on whether an appellate court would consider the merits of the separate jury argument. Nor is this explanation adequate to justify the decision to read the psychiatrist's report into the record, rather than calling the expert as a witness if counsel believed it possible that the expert would offer any evidence on which a verdict of not guilty by reason of insanity might be returned.[37] In electing to read the report to the jury, counsel placed before the jury evidence that counsel should have recognized could be prejudicial to his client at the penalty phase. Not only was the jury reminded of the expert's guilt-phase testimony that defendant had stated that he was very prejudiced against Mexicans, but at the sanity phase defendant's scorn for rehabilitation and prediction that he would kill again if released were made known to the jury.[38]

---

[37] Counsel explains further in a declaration filed in the habeas corpus proceeding that he read the report rather than call the expert because he believed any testimony would be duplicative, the expert having testified at the guilt phase, and thus by reading the report he would save time and the county's money. This reasoning does nothing to alter our conclusion that this was not a competent tactical decision.

[38] The report included the following: "He said that if he had his way he would call off this whole bunch of crap. He said he thinks this whole trip is a bunch of 'S.' He said he would just like to get it over with and take what is coming to him.

"He does not think jail will do him any good, but he is not saying he wants to go to a hospital. He said jail is not hard on him but out there is hard on him.

"He said that if he does twenty years in prison he will get out and probably do the same thing again. He said he does not understand what is going on out there.

"He has been in institutions off and on with some regularity for more than half of his lifetime, since he was 13 years of age.

". . . . . . . . . . . . . . . . .

"He sums it up by telling me that, one, he rejects authority and always will. Two, he does not go for the rehab bullshit. Three, he goes by the same code of ethics whether he is inside or outside of jail. Four, he is very prejudiced against Mexicans.

". . . . . . . . . . . . . . . .

No limitations were placed on the purposes for which the jury was permitted to consider the evidence presented at the sanity phase of the trial. At the penalty phase the jury was instructed that they should consider all of the evidence presented at the earlier phases in making their penalty decision. Defendant's counsel was aware that this evidence would be considered by the jury, and the evidence was certainly not overlooked by the prosecutor in his closing argument. Referring to another part of the psychiatrist's report he reminded the jurors that they had heard defendant talk about his prior violent conduct "when he talked to the psychiatrist. That is he told him that he had almost previously killed the people in a robbery. [¶] He told them that he had previously cut up a junkie." And in his closing argument, advising the jury that it must choose between life without possibility of parole and death, the prosecutor reminded the jury that the psychiatrist believed defendant had no conscience, and that he had told the doctor that "[i]f I'm out in 20 years, I'd do it all over again."

Counsel read this report to the jury shortly before noon on April 10, 1979. The penalty trial was conducted the following morning. At 2:33 p.m. on April 11, 1979, the jury returned its verdicts of death.

Counsel's tactical decision, leading to the introduction of highly prejudicial evidence at the sanity phase, evidence which was considered by the jury in determining the penalty, was not within the range of acceptable performance by attorneys representing criminal defendants.

■ Nonetheless, as we have noted earlier, even an inexcusable omission or lapse by counsel does not warrant reversal on grounds that a defendant received constitutionally inadequate representation unless the defendant was prejudiced by counsel's conduct. (*Strickland* v. *Washington, supra,* 466 U.S. 668, 690 [80 L.Ed.2d 674, 695]; *People* v. *Phillips* (1985) 41 Cal.3d 29, 60 [222 Cal.Rptr. 127, 711 P.2d 423].)

*Strickland* was a capital case. In that decision the United States Supreme Court, for the first time, considered the meaning of the constitutional requirement of effective assistance of counsel in cases in which "actual ineffectiveness" was claimed. The court reasoned that because the purpose of the requirement is to ensure a fair trial, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." (466 U.S. at p. 686 [80 L.Ed.2d at pp. 692-693].) The same standard applies to the penalty phase of a capital

"I think he remains a danger to the health and safety of others, himself included. The reason I say this is because I think he is sociopathic, impulsive and acts without thinking and could commit the same offense again toward others or himself, in fact he says this himself."

case since a sentencing proceeding is "sufficiently like a trial in its adversarial format and in the existence of standards for decision . . . that counsel's role in the proceeding is comparable to counsel's role at trial—to ensure that the adversarial testing process works to produce a just result under the standards governing decision." (*Id.* at pp. 686-687 [80 L.Ed.2d at p. 693].) Reversal of a conviction is not required, therefore, unless the defendant first demonstrates that counsel's performance was actually deficient, and then demonstrates that his defense was prejudiced. "This requires a showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." (*Id.* at p. 687 [80 L.Ed.2d at p. 693].) "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." (*Id.* at p. 691 [80 L.Ed.2d at p. 696].)

We have concluded above, and the People do not dispute, that in some respects counsel's performance in his defense of appellant fell below the standard to be expected of competent, experienced criminal defense counsel. Only the second question need be addressed here. Did counsel's failures deny appellant a fair penalty trial, or stated otherwise, can it be said that the verdicts of death in this case are the result of a breakdown of the adversarial process at the penalty phase which renders these verdicts unreliable?

"When a defendant challenges a death sentence . . . the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence —would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." (*Strickland* v. *Washington, supra,* 466 U.S. 668, 695 [80 L.Ed.2d at 674, 698].) "[A] court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." (*Id.* at p. 696 [80 L.Ed.2d at p. 698].)

Applying the standards and the techniques suggested by the United States Supreme Court for making the prejudice analysis to the facts of this case, we conclude that defendant has not carried this burden. Given the overwhelming number of aggravating factors, and the quality of the representation that counsel did offer at the penalty trial, that trial was not fundamentally unfair. There was no breakdown in the adversarial process, and it is not reasonably likely that the result would have been different but for counsel's failings.

## OTHER PENALTY-PHASE CLAIMS

No evidence was presented at the trial on the question of penalty. The jury was instructed prior to argument by counsel that the People bore no burden of proof, and that the reasonable doubt standard was inapplicable. Following argument, the court instructed the jury to consider all of the evidence presented during any part of the trial, taking into account the statutory aggravating and mitigating factors.[39]

### 1. *Instructions*

During his argument to the jury the prosecutor had told the jurors that they would be instructed that if aggravating circumstances outweighed mitigating "it says you shall impose death." Referring to this argument the court then instructed the jury otherwise, stating that "the law does not say you shall do one or the other."[40] No instruction was given restricting the jury's discretion beyond that directing them to consider the evidence and the aggravating and mitigating circumstances. No instruction was given at this phase of the trial that restricted action on the basis of sympathy or mercy toward defendant. (Cf. *People* v. *Lanphear* (1984) 36 Cal.3d 163 [203 Cal.Rptr. 122, 680 P.2d 1081]; *People* v. *Easley* (1983) 34 Cal.3d 858 [196 Cal.Rptr. 309, 671 P.2d 813].) The jury had been instructed prior to submission of the guilt and special circumstances issues that "in determining whether the defendant is guilty or not . . . you must not be governed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling," but no comparable limitation was imposed at the penalty trial. ■ As there is no obligation to instruct expressly that sympathy for a defendant may be considered (see *People* v. *Allen, supra,* 42 Cal.3d 1222, 1276), there was no error in this regard.

---

[39] See footnote 35, *ante,* p. 950.

[40] In contrast to instructions which convey the impression that death is a mandatory penalty (see *People* v. *Brown* (1985) 40 Cal.3d 512, 544, fn. 17 [220 Cal.Rptr. 637, 709 P.2d 440]), the instructions here did not limit the jury's discretion in selecting the appropriate penalty. The full instruction stated: "Now, ladies and gentlemen, if during the course of the argument you thought you heard any comment about the law as being that it says that you shall impose a sentence of death if you conclude that the aggravating circumstances outweigh the mitigating circumstances, or you shall impose mitigating—excuse me, life imprisonment without the possibility of parole if you feel that mitigating circumstances outweigh the aggravating circumstances, I tell you that's not the law that applies to the case.

"You may use those. As the way in which you go about this. But the way in which you go about it is up to you. And the law does not say you shall do one or the other.

"It is now your duty to determine which of the two penalties, death or confinement in the state prison for life without possibility of parole, shall be imposed on the defendant.

"After having considered all of the evidence in this case and having taken into account all the applicable factors upon which you have been instructed, you shall determine whether the penalty to be imposed on the defendant shall be death or confinement in the state prison for life without possibility of parole."

### A. Guiding Jury Discretion

Defendant claims nonetheless that the instructions given were constitutionally inadequate because they failed to "channel" the jury's discretion by affording the "clear and objective standards" or "specific and detailed guidance" held by the United States Supreme Court to be required by the Eighth Amendment. Defendant's argument, based on isolated language in the court's decisions in *Gregg* v. *Georgia* (1976) 428 U.S. 153, 198 [49 L.Ed.2d 859, 888-889, 96 S.Ct. 2909], and *Proffitt* v. *Florida* (1976) 428 U.S. 242, 253 [49 L.Ed.2d 913, 923, 96 S.Ct. 2960], is directed first to the statutory scheme, the 1977 death penalty statute itself (former §§ 190-190.5). He acknowledges the contrary conclusion of this court expressed in *People* v. *Frierson, supra,* 25 Cal.3d 142, and reaffirmed both in *People* v. *Jackson* (1980) 28 Cal.3d 264, 315-317 [168 Cal.Rptr. 603, 618 P.2d 149] and *People* v. *Harris* (1981) 28 Cal.3d 935, 964 [171 Cal.Rptr. 679, 623 P.2d 240], but urges reconsideration. We find no necessity to do so.

Any issue as to the adequacy of the 1977 death penalty law in this regard has been resolved by the United States Supreme Court's opinion in *Pulley* v. *Harris, supra,* 465 U.S. 37, 53 [79 L.Ed.2d 29, 42], where the court said: "By requiring the jury to find at least one special circumstance beyond a reasonable doubt, the statute limits the death sentence to a small subclass of capital-eligible cases. The statutory list of relevant factors, applied to defendants within this subclass, 'provide[s] jury guidance and lessen[s] the chance of arbitrary application of the death penalty,' [*Harris* v. *Pulley* (9th Cir. 1982)] 692 F.2d, at 1194, 'guarantee[ing] that the jury's discretion will be guided and its consideration deliberate,' *id*, at 1195. The jury's 'discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.' *Gregg,* 428 U.S. at 189. Its decision is reviewed by the trial judge and the State Supreme Court. On its face, this system, without any requirement or practice of comparative proportionality review, cannot be successfully challenged under *Furman* and our subsequent cases."

### B. Correcting Reference to Mandatory Penalty

■ Defendant also argues that the instructions were inadequate because the court interjected the admonition to disregard the prosecutor's argument, based on language in the 1978 death penalty statute, that imposition of the death penalty was mandatory if the jury found that aggravating circumstances outweighed mitigating. He claims that this admonition and the related instruction that "you may use those. . . . But the way in which you go about it is up to you . . . the law does not say you shall do one or the other" were ambiguous. The latter reference to "those" might, he sug-

gests, be understood to mean either that the jury could consider the aggravating or mitigating circumstances, or that the jury could determine the penalty in the manner proposed by the prosecutor.

We disagree. The court properly and with some prescience, corrected the prosecutor and thereby avoided error of the type that necessitated reversal of the penalty in *People* v. *Easley, supra,* 34 Cal.3d 858, 884-885. That instruction adequately and correctly advised the jury that they were free to consider the relevant aggravating and mitigating circumstances but were not required by the law to impose either penalty based upon the outcome of a mechanical weighing process.[41]

## C. *Consideration of Nonstatutory Aggravating Factors*

Defendant claims that the instructions also permitted the jury to consider aggravating factors not authorized by statute. He reasons that because the instruction did not mandate consideration of the statutory factors, it permitted the jury not only to disregard them, but also to consider other nonstatutory factors. Again, we disagree. The jury was expressly instructed that in determining the penalty "you shall consider, take into account and be guided by" the statutory factors. This obligation had also been emphasized during closing arguments by both the prosecutor and defendant's counsel. The clarifying instruction which defendant now claims created ambiguity as to this responsibility was clearly directed only to the earlier statement by the prosecutor.

It is also urged that because the court instructed the jury that all evidence offered at the guilt phase might be considered, the jurors may have relied in part on nonstatutory aggravating factors, i.e., the evidence of defendant's past criminal conduct which did not involve the use of or threat to use force (former § 190.3, subd. (b)) in its decision. The instructions did, however, include this limitation in advising the jury of the factors to be considered. Any further limitation on the jury's consideration of defendant's past criminal conduct would have precluded consideration of that evidence for the purpose for which *defendant* introduced it, and upon which he based his penalty-phase plea for mercy, that his decision and judgment had been affected by his drug use, and that "[e]very incident that was brought into the case, whether it be the incident in Modesto or whether it be other

---

[41] This conclusion is buttressed by the fact that after the prosecutor's opening penalty-phase argument, and the court's conference with counsel during a recess, defendant's attorney advised the jury at the outset of his argument that "if something comes out that it's mandatory, you don't hear that in the instructions, your obligation would be to disregard whatever counsel may have said about something being mandatory and use your judgment and discretion."

conduct . . . were all situations in which drugs was [*sic*] heavily involved. We cannot erase one from the other . . . drugs do have an effect on a person's mind, sometimes they affect his culpability . . . he's not somebody that is devoid of a history, and that history is significant . . . ."

### D. *Proof of Prior Crimes Beyond a Reasonable Doubt*

For the same reason we reject defendant's claim that the court erred in failing to instruct the jury that before the prior criminal conduct could be considered in determining the appropriate penalty, the crimes must be proven beyond a reasonable doubt. A plurality of this court stated in *People* v. *Robertson, supra,* 33 Cal.3d 21, 53, that the rule of *People* v. *Stanworth* (1969) 71 Cal.2d 820, 840 [80 Cal.Rptr. 49,. 457 P.2d 889], was applicable to jury consideration of other-crimes evidence during the penalty phase of a capital trial conducted under the 1977 death penalty law. *Stanworth* held that "[i]t is now settled that a defendant during the penalty phase of a trial is entitled to an instruction to the effect that the jury may consider evidence of other crimes only when the commission of such other crimes is proved beyond a reasonable doubt," and that the court must so instruct sua sponte. The evidence of other crimes in *Robertson* and *Stanworth* was introduced by the prosecution as an aggravating factor. Justice Broussard, concurring, concluded that on the facts of *Robertson* the instruction should have been given. He noted, however, that other-crimes evidence was often admissible for other purposes at a penalty trial, among which was to show that the defendant's mental faculties were impaired, a mitigating factor. When offered for this purpose, Justice Broussard suggested, "there is no reasonable doubt standard to be met before the jury can consider that evidence." (33 Cal.3d at p. 61.)

The exception anticipated by Justice Broussard in *Robertson* is present here. The evidence of uncharged crimes was introduced by and relied on by defendant at all three phases of the trial—guilt, sanity, and penalty. He admitted commission of these crimes in his testimony at the guilt phase and in his statements to the psychiatrists which he read into the record during the sanity phase.[42] In these circumstances it cannot reasonably be said that

---

[42] Defendant disputes the conclusion that he admitted the commission of the robbery in the John Street Park in Modesto, or that he used force directed at the victims. He claims that his testimony was only that Tyson initiated the robbery, and after it had been completed he told the victims to run and fired in the air "for that purpose." This characterization of his testimony is inaccurate. In fact, he testified that Tyson said he would "get us a ride." The defendant then told Tyson, "Well, head on," and followed him. Tyson then "threw [*sic* – drew] down" on the victims but was so drunk that he fell and hit his head on the bumper of the car. "But he like already threw down on them. And I told them to tell them, you know, try to tell them to come out and hit the ground. . . . And Tyson got into the back of the camper . . . looking for some keys. And he threw the keys at me, but he threw them over my head. And I told

the prosecution must prove their commission. Defendant has no burden under the reasonable-doubt standard. Although the jury might have considered the evidence of other crimes for a purpose other than mitigation the court had no obligation to instruct the jury here that this evidence, introduced by defendant, could not be considered an aggravating factor unless proved beyond a reasonable doubt, but could be considered in mitigation under a lesser standard. Neither our Constitution, nor the statutory and judicially pronounced rules governing the trial of criminal proceedings requires that such metaphysical distinctions be made by a jury. (Cf. *People* v. *Aranda* (1965) 63 Cal.2d 518, 525 [47 Cal.Rptr. 353, 407 P.2d 265] ["The rule calls upon the jury to perform 'a mental gymnastic which is beyond not only their powers, but anybody's else'"].) Defendant asked the jury to believe that he had committed the prior offenses. He may not now be heard to complain that they did.

### E. *Reference to Irrelevant Statutory Factors*

Defendant next argues that the court erred in failing to delete reference to irrelevant mitigating factors from the instruction on aggravating and mitigating circumstances. He cites in particular factors (d) and (e), whether the victim was a participant in or consented to the homicidal conduct, and whether the circumstances were such that the defendant believed his conduct to be morally justified or extenuated.

We do not agree with the assumption implicit in defendant's argument that the instruction, given pursuant to statute, included irrelevant factors. While not all of the factors were applicable to the circumstances of defendant's crimes, they were relevant in the determination by the jury of the appropriate penalty. Their relevance lies in the fact that the Legislature has identified each of them as a proper consideration in the selection of an appropriate penalty. The instruction calls the attention of the jury to the range of factors considered in all capital sentencing and thereby assists the jury in weighing the relative culpability of the defendant and heinousness of his or her offense.

An instruction which directs the jury's attention to the factors that the state considers particularly relevant assists the jury in selecting the appro-

---

him to get the keys. And he got the keys. And I just turned around and told the people to run. And they jump and they broke. And I popped, I don't know, two or three caps over their heads."

On cross-examination petitioner testified that he and Tyson both had guns in their hands when they approached the camper, and both of them "did the talking." Defendant testified that he took a wallet from the male victim's back pocket. The dispute was as to whether petitioner shot at the fleeing couple or in the air. There is no dispute as to defendant being an active participant in the robbery or as to whether he admitted that it was a crime in which threatened force was involved.

priate penalty by narrowing or channeling the focus of the jury's discretion. The instruction helps the jury to determine the appropriate penalty in light of all the factors which the state considers relevant. The instruction thereby lessens the possibility that the penalty of death may be imposed arbitrarily or capriciously. (Accord *People* v. *Miranda* (1987) 44 Cal.3d 57, 104-105 [241 Cal.Rptr. 594, 744 P.2d 1127]; *People* v. *Ghent* (1987) 43 Cal.3d 739, 776-777 [239 Cal.Rptr. 82, 739 P.2d 1250].)

We agree with defendant that the absence of any of the statutory mitigating factors should not be considered aggravating (*People* v. *Davenport* (1985) 41 Cal.3d 247, 289 [221 Cal.Rptr. 794, 710 P.2d 861]), but no instruction was given here that might suggest to the jury that it should look at the absence of mitigating factors from that perspective. Although the prosecutor referred to those factors that were not applicable here, recalling for the jury evidence that would disprove their presence, he did not go beyond that approach to argue that their absence was an aggravating factor which militated in favor of the death penalty. Rather he properly asked the jury rhetorically, "do you find anything that mitigates for the defendant?" and exhorted the jury "weigh the aggravating and you weigh the mitigating."[43]

### F. *Application of Reasonable-Doubt Standard to Penalty Selection*

Defendant next contends that the judgment must be reversed because the jury was not instructed that it must find beyond a reasonable doubt that death was the appropriate penalty. We reject that claim. The trial court properly instructed the jury that the People had "no burden of proof." We are satisfied that the instructions now given to the jury regarding its obligation to consider any mitigating evidence proffered by a capital defendant are adequate to impress the jurors with the high degree of certainty a juror should have before voting to impose the death penalty. Since the decision is a normative judgment reflecting the juror's individual moral assessment of the defendant's culpability (see *People* v. *Allen, supra,* 42 Cal.3d 1222, 1287), application of a reasonable-doubt standard is neither appropriate nor constitutionally compelled. (See also, *People* v. *Miranda,*

---

[43] At one point in his opening penalty-phase argument the prosecutor did make one reference to an inapplicable factor that might have suggested to the jury that its absence should be weighed as an aggravating factor. He stated: "Now another consideration that you must make in connection with this offense is, did the victims participate or consent to this homicidal act? I don't mean to insult your intelligence, but it's a factor, it's either an aggravating or it's a mitigating factor." He went on, however, to suggest as an example of mitigation, the participation of a coperpetrator who was shot by the victim of a robbery. He did not return to the "aggravating factor" concept and defendant did not object to the argument. We do not deem the argument to have been either misconduct or prejudicial.

*supra,* 44 Cal.3d 57, 107; *People* v. *Rodriguez, supra,* 42 Cal.3d 730, 777-779.)

### G. *Other Claims*

Defendant repeats his earlier claims of error with regard to the capacity in which Doctors Brannan and Lloyd were appointed and to the admission in evidence at the guilt and sanity trials of the incriminating statements he made to the psychiatrists, urging these same errors as penalty phase error because the jury was instructed to consider all of the evidence presented during those phases in determining the penalty. He also argues that the statements were obtained in violation of his Fifth Amendment privilege against self-incrimination, and again asserts error in the court's failure to instruct the jury that the statements could not be considered for the truth of the facts contained therein.

Only the self-incrimination claim differs from those considered and rejected above. Defendant made no objection to consideration of the evidence on this or any other ground and is therefore precluded from urging its admission as error on appeal. As discussed above this omission appears to have been a deliberate tactical choice by counsel who intended to and did rely on defendant's background as support for his argument that defendant's culpability was affected by intoxication and/or mental defect.[44] An objection would have been meritless in any event. The appointment of a psychiatrist pursuant to sections 1026 and 1027 is made only in response to the defendant's entry of a plea of not guilty by reason of insanity. The examination, initiated at the behest of the defendant, is not "compelled" and *Miranda*[45] warnings are not required. ■ Statements made to the examining psychiatrist are admissible at the guilt and sanity phases of the trial if the defendant puts his mental state in issue. (*People* v. *Arcega, supra,* 32 Cal.3d 504, 521.) At the penalty phase defendant again placed his mental state in issue, inviting the jury to reject death as the appropriate penalty in light of his history of mental illness or diminished capacity. Although the question of admissibility at the penalty phase of psychiatric evidence obtained in a sanity examination was not resolved in *Arcega* or *Estelle* v. *Smith* (1981) 451 U.S. 454 [68 L.Ed.2d 359, 101 S.Ct. 1866], the Supreme Court has recently confirmed that when a defendant initiates a psychiatric examination by court-appointed experts, admission of the defendant's statements in a subsequent proceeding in which he has placed his mental state in issue

---

[44] For similar reasons, the court had no duty to instruct the jury that the corpus delicti of the other crimes had to be proven independently and that his admissions should be viewed with caution. We note that many of the other crimes had been established independently of his out-of-court statements. He had testified regarding them.

[45] *Miranda* v. *Arizona, supra,* 384 U.S. 436.

violates neither his Fifth Amendment right against self-incrimination nor his Sixth Amendment right to counsel. Even if the defendant or his counsel is not aware at the time of the examination of all of the possible uses to which his statements might be put, he is on notice that they are admissible in rebuttal in such proceedings. (*Buchanan* v. *Kentucky* (1987) 483 U.S. 402, __ [97 L.Ed.2d 336, 354-357, 107 S.Ct. 2906, 2916-2919].)

Defendant next contends that the prosecutor engaged in misconduct during his opening and closing penalty-phase arguments by making inflammatory statements based on facts not in evidence, misstating the law, and making reference to irrelevant factors, and thereby "corrupted the entire penalty phase of the trial." Not only do we disagree with the assertion that specific portions of the argument which defendant cites as misconduct were improper, but we note that defendant failed to object to any aspect of the argument. (*People* v. *Haskett* (1982) 30 Cal.3d 841, 863 [180 Cal.Rptr. 640, 640 P.2d 776]; *People* v. *Green, supra,* 27 Cal.3d 1, 27.)[46] The trial court promptly and properly corrected the erroneous statement of the prosecutor regarding the jury's obligation in weighing aggravating and mitigating circumstances. To the extent that any other part of the argument might have been misleading or improper, it could have been clarified or cured by a prompt admonition had there been a timely objection. (*People* v. *Murtishaw, supra,* 29 Cal.3d 733, 757-758.)

Defendant first cites the prosecutor's reference to "irrelevant" aggravating and mitigating factors. In his opening argument the prosecutor listed in abbreviated form, the 10 statutory factors to be considered by the jury in selecting the appropriate penalty, and then examined their relevance by pointing to the presence or absence of evidence to establish the existence of such factors. As to each he assumed, and by implication invited the jury to accept his assumption, that the factor was aggravating or mitigating. The

[46] Defendant notes that an unreported conference was held at the bench at the close of the prosecutor's opening penalty-phase argument and deduces that defense counsel made an objection at that time. He mischaracterizes the record in asserting that the judge interrupted the prosecutor. The record clearly establishes that the prosecutor had concluded. He asked the jury to consider his comments while defendant's counsel spoke to them, and told them that he would speak to them again. Because defense counsel opened his argument with advice to ignore what had been said about "something being mandatory" if the instructions were otherwise, defendant now asserts that counsel must have objected to all of the "misconduct" he now identifies, or alternatively was incompetent. It is equally if not more probable, since the judge initiated the conference, that the judge himself sought to correct a misstatement as to the "mandatory" nature of the 1977 law, an issue to be addressed *post.*

Defendant's assertion that he has made "several strenuous attempts" to ascertain what occurred at "several crucial unreported bench conferences" and that such attempts were "futile" appears disingenuous at best. A settled statement of unreported conferences is part of the record. The transcript of proceedings reflects no attempt to obtain settlement of the record as to this conference.

argument did not suggest that the absence of a mitigating factor or factors was itself aggravating.

With regard to the circumstances of the offense the prosecutor asked the jurors to recall that three persons had been murdered, and the jury had found the killings to be willful, deliberate, and premeditated, and that two had occurred in the commission of robbery.

The prosecutor then briefly summarized the evidence of prior violent criminal conduct, including that which defendant had described in his interviews with the examining psychiatrists.

Referring to the third factor, acting under extreme mental or emotional disturbance, the prosecutor asked the jurors to recall their deliberations during the guilt phase as to impaired capacity, consider the evidence related to the manner and circumstances in which the killings were committed, and petitioner's statement to the officers who transported him from Arizona.

With respect to remorse, the prosecutor emphasized evidence regarding defendant's actions after the murder of Miguel and Salvador Vargas as demonstrating a lack of remorse. As to whether defendant acted under the domination of Tyson, the prosecutor recalled the evidence that defendant planned and took the lead in committing the crimes, and had described Tyson as "sniveling."

The final factor, whether the victims participated in or consented to the homicidal acts, was dismissed with this comment: "I don't mean to insult your intelligence, but it's a factor, it's either an aggravating or it's a mitigating factor." The prosecutor then suggested a robbery scenario, in which the victim of a murder was one of the robbers shot by the resisting robbery victim, as an example of "consent" by consenting to the felony, concluding that "in this particular case, it would seem to insult, seriously insult the mind of any reasonable juror to say that the victims in this case participated in any of the acts that resulted in the deaths of Miguel and Salvador."

After a brief discussion of the evidence and similar reference to Lourdes Meza's lack of consent or participation, the prosecutor then referred to the absence of any basis for concluding that defendant believed his acts were morally justified, again suggesting circumstances in which that factor might be present. He then summed up by briefly mentioning and dismissing the other factors that, if present, might be considered mitigating—whether defendant was a "mere accomplice," was under the "substantial domination of Tyson, lacked capacity to appreciate the criminality of his conduct or his mental capacity was substantially impaired," and whether any other rele-

vant factor was mitigating. In relation to that possibility, the prosecutor suggested that defendant's age, 37 years, was not mitigating. He was not a youngster, but was of an age in which responsibility should be assessed.

The prosecutor closed this argument by asserting that defendant apparently had an intent to kill and recalling evidence that when asked by an officer which person came to the door of the victim's home, defendant replied. "He's just a Mexican."

The prosecutor's closing argument was a somewhat confusing melange of ideas, emphasizing the apparent lack of remorse reflected in defendant's statement to Dr. Brannan that if released in 20 years he would do it again,[47] and the evidence that had been offered to rebut the defense of diminished capacity.

Defendant first asserts as misconduct the reference to all 10 of the statutory factors enumerated in section 190.3 of the 1977 death penalty law, and the argument based thereon. We disagree. As we have pointed out earlier, instructions are properly given on all of the statutory factors that the Legislature has identified as considerations which the state believes are particularly relevant to selection of the appropriate penalty. It follows that it is proper for counsel in argument to assist the jury in determining the relevance of those factors, or lack thereof, in the case before it. A capital jury, lacking the overview of cases in which the death penalty has been imposed that a judge might have, is not familiar with the range of factors by which culpability is appropriately assessed in such cases. When counsel do this by summarizing or marshalling the evidence and arguing its relation to those factors in light of the full range of factors identified by the state as particularly relevant, a capital jury is better able to place the particular defendant's conduct in perspective. If all jurors are made aware of these factors, their exercise of discretion is further channeled and directed, and the possibility of arbitrary or capricious imposition of the death penalty is lessened. Indeed, giving the jury this type of guidance was encouraged by the United States Supreme Court in *Gregg* v. *Georgia, supra,* 428 U.S. 153, 192 [49 L.Ed.2d 859, 885], where the court recognized that jury inexperience in sentencing might make it difficult for jurors to recognize and properly use information relevant to the sentence choice. The court said there: "[T]he problem will be alleviated if the jury is given guidance regarding the

---

[47] Defendant claims that the prosecutor's argument that defendant lacked remorse was misconduct because there was no evidence to support that conclusion. Circumstantial evidence had been introduced which arguably did support that argument among which was his statement to the police officer that one victim was "just a Mexican," and the evidence of defendant's conduct after the killings.

factors about the crime and the defendant that the State, representing organized society, deems particularly relevant to the sentencing decision."

The single statement by the prosecutor here that the participation or consent to the homicidal-act factor had to be either aggravating or mitigating cannot fairly be characterized as defendant does—as misconduct applicable to every factor. The related argument emphasized circumstances of the crime and the lack of any prior relationship or involvement of the victims with defendant and Tyson, a proper subject for argument. Similarly, the argument about age explained to the jury the situation in which age might be mitigating, but did not suggest that defendant's age was an aggravating factor. The argument itself left that factor in a neutral posture.

After his examination of the 10 statutory factors the prosecutor asked rhetorically: "So as you consider these, how do you add these up?" Sometime later in his peroration he asked: "Do you find anything there that mitigates for the defendant? Weigh the aggravating and you weigh the mitigating.

"Now can you conscientiously . . . go through this list of circumstances to consider and tell us that you find that the mitigating circumstances outweigh the aggravating."

Defendant also assigns this argument as misconduct, reading into it a suggestion that the jury should weigh the aggravating and mitigating factors in numerical terms and make the penalty selection a quantitative determination. Again, we disagree. Unlike the instruction that necessitated reversal in *People* v. *Brown, supra,* 40 Cal.3d 512, a case tried under the 1978 law, the jury here was not instructed in mandatory terms that it must impose the death penalty if it found the aggravating circumstances outweighed the mitigating.

Although at the outset of his argument the prosecutor had told the jury this was the law, defense counsel had warned the jury that "if something comes out that indicates to you it's mandatory, you don't hear that in the instructions, your obligation would be to disregard whatever counsel may have said about something being mandatory and use your judgment and discretion." Then, after the closing argument, the court corrected any misunderstanding the jury might have had in that regard, telling the jury "that is not the law that applies to this case" and expressly told the jury that while it might use the factors, "the way you go about it is up to you. And the law does not say you shall do one or the other." (Cf. *People* v. *Easley, supra,* 34 Cal.3d 858, 881-884.) We do not agree with defendant that the prosecutor's exhortation to weigh the aggravating and weigh the mitigating

factors implied a mechanical or numerical comparison, and if this impression were left we have no doubt that it was adequately dissipated by the court's instructions.

▮ We reject defendant's claim that the prosecutor's comment on lack of remorse violated his Fifth Amendment privilege against self-incrimination, and constituted misconduct because that consideration is not a statutory aggravating factor. Prosecutorial comment on a defendant's silence may in some instances violate the privilege against self-incrimination. (*Griffin* v. *California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229].) The argument here did not, however, either directly or indirectly, call to the attention of the jury defendant's failure to testify (cf. *People* v. *Vargas* (1973) 9 Cal.3d 470 [108 Cal.Rptr. 15, 509 P.2d 959]), nor was it directed to prearrest silence in circumstances in which that silence might reflect an exercise of that privilege. This is not a case in which the defendant asserted the privilege. He confessed to the police. He described the crimes to the psychiatrists, and in his testimony at trial, but in none of his statements about the crimes did he express sorrow. Comment regarding this omission invaded no constitutional right or privilege.[48]

The presence or absence of remorse was recognized as a factor relevant to the penalty decision under the prior law (*People* v. *Coleman* (1969) 71 Cal.2d 1159, 1168 [80 Cal.Rptr. 920, 459 P.2d 248]), although it is not among the statutorily enumerated aggravating factors in the 1978 law. The court held in *People* v. *Boyd* (1985) 38 Cal.3d 762, 772-773 [215 Cal.Rptr. 1, 700 P.2d 782], that under the 1978 law the prosecutor may not introduce evidence that is irrelevant to the statutory aggravating factors. Because remorse is universally accepted as a possibly mitigating factor, however, the prosecutor may call to the attention of the jury an apparent absence of remorse in a defendant who has admitted that he has killed another human being. (*People* v. *Ghent, supra,* 43 Cal.3d 739, 771.)

The prosecutor's argument here went no further than that. It was in accord with the prior law and the 1977 statute has not been construed to prohibit reference to a consideration any juror, without the necessity for instruction or argument, would have in mind. The prosecutor's references

---

[48] The United States Supreme Court has explicitly rejected the theory advanced by defendant, holding that placing a defendant in the position of having to waive his privilege against self-incrimination in order to testify or deliver an allocution at the penalty phase of a capital case does not impermissibly burden his exercise of the privilege, and that he may not limit the effect of evidence he gives to consideration only as to penalty. A fortiori, he may not complain that the prosecutor's comment on the relevance of other guilt-phase evidence to the penalty decision unduly burdens his exercise of the privilege because he would be compelled to waive it in order to testify in rebuttal. (See *Crampton* v. *Ohio* (1971) 402 U.S. 183, 213-217 [28 L.Ed.2d 711, 729-732, 91 S.Ct. 1454], decided with *McGautha* v. *California.*)

to defendant's apparent lack of remorse could hardly have done more than call the jury's attention to that which was apparent from the evidence.

Even were the 1977 law construed to prohibit reference to nonstatutory aggravating factors at the penalty phase, or argument that lack of remorse should be considered aggravating in selecting the penalty, the rule could not prevent a capital juror from bringing to bear on his decision knowledge gained from his life experience. The United States Supreme Court has indicated that to do so would be constitutionally impermissible.

"Any sentencing decision calls for the exercise of judgment. It is neither possible nor desirable for a person to whom the state entrusts an important judgment to decide in a vacuum, as if he had no experiences. . . . [¶] We have never suggested that the United States Constitution requires that the sentencing process should be transformed into a rigid and mechanical parsing of statutory aggravating factors. But to attempt to separate the sentencer's decision from his experiences would inevitably do precisely that. It is entirely fitting for the moral, factual, and legal judgment of judges and jurors to play a meaningful role in sentencing." (*Barclay* v. *Florida, supra,* 463 U.S. 939, 950 [77 L.Ed.2d 1134, 1144].)

The prosecutor's reference to defendant's apparent lack of remorse was not misconduct.

■ Defendant next assigns as misconduct the prosecutor's comments to the jury about the victims, asserting that this portion of the argument was an appeal to passion and prejudice. Again, we note there was no objection on this ground, but such objection would not have been meritorious. In fact, the argument appeared to be no more than low key rhetoric. The idea of retribution was not put forth. (Cf. *People* v. *Floyd* (1970) 1 Cal.3d 694, 721, 722 [83 Cal.Rptr. 608, 464 P.2d 64].) Nor did the prosecutor appeal to racial prejudice or otherwise engage in conduct which seriously threatened juror objectivity. (Cf. *People* v. *Bain* (1971) 5 Cal.3d 839, 848-849 [97 Cal.Rptr. 684, 489 P.2d 564].) He simply asked that the jury not forget the victims and that the jurors consider the lives they might have had. This argument is permissible at the penalty phase. (*People* v. *Haskett, supra,* 30 Cal.3d 841, 864.)

Defendant also urges that there was misconduct in the prosecutor's asking the jurors to recall their "promise" on voir dire, that if sworn as jurors they would consider imposition of the death penalty if it was appropriate. ■ We find no error in reminding the jurors of their obligation at the penalty phase to consider the death penalty. This argument did not improperly convey to the jury the prosecutor's personal view or belief that

the case was an appropriate one. The use of the word "promise" was an accurate description of the obligation assumed by the jurors' oaths and was consistent with the subsequent instruction by the court that it was now the "duty" of the jury to select which of the two possible penalties should be imposed.

■ Defendant also argues that the prosecutor's reference to the alleged "rape" of Lourdes Meza was improper in light of the prior finding that her murder was not committed during the perpetration or attempted perpetration of rape. The actual statement during argument was to "intercourse," not rape. This reference was not, however, like that condemned by this court in *Haskett, supra,* 30 Cal.3d 841. It did not suggest that the jury verdict rejecting that charge had been erroneous, or impliedly criticize the jury. Since defendant admitted, during his trial testimony, the act of intercourse to which the prosecutor referred, the statement was supported by the evidence and was proper. (See *People* v. *Love* (1961) 56 Cal.2d 720, 730 [16 Cal.Rptr. 777, 366 P.2d 33].) The reference to defendant's admission that he had intercourse with Lourdes Meza during the trip to Sonora was offered as illustrative of defendant's lack of remorse for the murders of Miguel and Salvador. We cannot say it was not relevant to his state of mind while transporting his third victim to the location at which she was to be killed.

■ Defendant next argues that it was error to permit the jury to consider the evidence contained in the psychiatrists' reports at the penalty phase. This evidence, he contends, without citation of authority other than section 1026, subdivision (a), which does not so provide, was admitted for the limited purpose of determining defendant's sanity at the time of the offense. Not only is this claim unsupported by authority, but there was no objection to jury consideration of the evidence, and defendant relied on the evidence.[49] The evidence was relevant to the statutory factor "[w]hether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or the affects of intoxication." (Former § 190.3, subd. (g).)

Because we conclude that there was no prosecutorial misconduct during the penalty-phase argument, we need not consider defendant's further claims that no objection is necessary to preserve for review on appeal such misconduct when it occurs during the penalty phase of a capital case; that the trial court denied defendant a fair trial by failing to intervene to curb the

---

[49] In his opening penalty-phase argument counsel asked the jury to consider the defendant's state of mind, his "capacity," and whether it was affected by intoxication, and referred to the report of Dr. Brannan which, he said, had concluded that "drugs were an important factor."

asserted misconduct; or that defense counsel's failure to object establishes constitutionally ineffective representation.

MOTION FOR MODIFICATION

Former section 190.4, subdivision (e), provided: "In every case in which the trier of fact has returned a verdict or finding imposing the death penalty, the defendant shall be deemed to have made an application for modification of such verdict or finding pursuant to subdivision (7) of Section 1181. In ruling on the application the judge shall review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances referred to in Section 190.3, and shall make an independent determination as to whether the weight of the evidence supports the jury's findings and verdicts. He shall state on the record the reason for his findings. [¶] The judge shall set forth the reasons for his ruling on the application and direct that they be entered on the Clerk's minutes. [¶] The denial of the modification of a death penalty verdict pursuant to subdivision (7) of Section 1181 shall be reviewed on the defendant's automatic appeal pursuant to subdivision (b) of Section 1239. The granting of the application shall be reviewed on the people's appeal pursuant to paragraph (6) of subdivision (a) of Section 1238."

The trial court denied defendant's application for modification in a four-page ruling, after orally stating the reasons for denial from the bench.[50]

---

[50] After stating the procedural background, the ruling recited: "In considering the application, the Court has reviewed the evidence, considered and taken into account the evidence upon each offense, and each special circumstance found by the jury to be true, and the aggravating and mitigating circumstances referred to in Penal Code section 190.3.

"The three deaths in this case occurred as the result of multiple gunshot wounds on each decedent, all inflicted by the Defendant.

"Defendant Williams and his co-defendant, Tyson, traveled from Galt to Merced, more than 75 miles, for the stated purpose of robbing and killing the three decedents. The home of the decedents was not easily found. Williams and Tyson made appropriate inquiries, found the place and visited with the three decedents and their three guests. After the guests departed, Williams and Tyson left but returned in a few minutes to accomplish their intended purpose.

"There was no quarrel, no heat of passion, certainly none aroused by the conduct or words of the victims. Blows were apparently struck on at least one of the decedents by either Williams or Tyson before Miguel and Salvador were killed.

"Thereafter Lourdes Meza was kidnapped. Her purse was taken by Williams. She was required to submit to acts of sexual intercourse while traveling to the place at which she was killed. She was taken into a field. Unclothed, she was placed on her hands and knees. She was shot four times. Her body was left in the field. The body was discovered five days later.

"The defendant has previously been committed to the CYA and prison.

"In stealing a camper in Modesto he fired shots, though presumably not at people.

"The Defendant was not mentally or emotionally disturbed at the time of commission of these offenses. (He said he was unhappy with Tyson for failing to take a weapon from Miguel.)

Defendant now contends that in denying the motion the judge considered factors contrary to the evidence and irrelevant to the penalty determination. In support of this claim defendant first argues that the court's statement that Lourdes Meza "was required to submit to acts of sexual intercourse while traveling to the place at which she was killed" was contrary to the evidence because he was acquitted of the special circumstance of having committed that murder during the commission or attempted commission of rape.

Defendant admitted during his testimony that he and Tyson kidnapped Lourdes Meza, that when she attempted to get out of the car he slapped her and Tyson knocked her into the backseat, and that he had sexual intercourse with her thereafter. The jury was instructed that to find the special circumstance of murder in the commission of rape true it had to find that: "One, that the murder was willful, deliberate and premeditated, two, that the defendant was personally present during the commission of the act or acts causing death, and, three, that defendant, with intent to cause death, and, four, that the murder was committed during the commission or attempted commission of a rape."

In argument the prosecutor explained to the jury that if the rape took place only in the car the killing nevertheless took place during the commission of rape if defendant had not yet reached a safe haven because the victim was still present. During jury deliberations the jury, through the foreman, inquired as to the relevant time period, stating: "We're not certain in our minds as to what period of time we must consider as to the occurrence of the rape, whether it must be actually done at the time of the crime when she was murdered or from the period of time when they left Merced to the point of the occurrence."

The court then reread to the jury the instructions on felony murder in the commission of rape (CALJIC No. 8.21) and the special circumstance instruction (CALJIC No. 884.3), the latter of which is quoted above and

---

"The victims did not consent and were not participants in the homicidal conduct.

"No circumstance could have reasonably caused the Defendant to have believed he was morally justified in killing any of the victims.

"The Defendant was the leader, not a follower of Mr. Tyson.

"The Defendant is old enough to know about, young enough to appreciate life.

"The only explanation given by the Defendant was his 'intense dislike of Mexicans.' The acts were cruel and calculated.

"The Defendant was emotionally calm during the entire trial.

"Having considered all of the foregoing and all other evidence received during the trial, the Court finds there is ample evidence to support and no reason to modify any of the several verdicts rendered by the jury. Particularly, in view of the intentional killing of three people and the statement by the Defendant that he might do it again, the Court finds no reason to modify the verdict and finding of the jury that the penalty for each offense should be death."

includes the requirement that "the murder was committed during the commission or attempted commission of a rape." The foreman asked for a copy of the felony-murder instruction and the court again read CALJIC No. 8.21. The jury then returned verdicts finding that the murder did not occur during or as a result of the commission of rape and finding the rape special circumstance untrue.

It is clear from this sequence of events that the jury rejected evidence that the murder occurred during the commission or attempted commission of rape or as a result of the commission or attempted commission of rape. It is not clear that the jury necessarily found there had been no rape. If any inference is possible, it is that the jury did believe there had been a rape, for otherwise the question about the time of the murder in relation thereto would have been superfluous. Inasmuch as the verdicts do not establish an acquittal of rape, however, we need not decide whether it is permissible to draw such inferences.

■■■ Defendant objects also to the court's consideration of his prior commitment to the Youth Authority on grounds that the commitment offense, theft of a motorcycle, did not involve force or threats of force. There is merit to defendant's claim that this commitment should not have been considered. It was not relevant to any of the factors enumerated in section 190.3 and could only have been considered an aggravating factor. In the context of the ruling it is clear that the judge did not consider the underlying offense only for its probative value in establishing the possibility that defendant suffered from mental disease or defect.

Nonetheless, we cannot conclude that consideration of this minor offense by a judge who had reviewed all of the evidence and recited numerous other substantial factors in his ruling was prejudicial.[51] The judge found "ample evidence" to support the verdicts of death and expressly tied his determination not to modify the verdicts to the fact that there had been an "intentional killing of three people" by a defendant who had stated he "might do it again." We are satisfied beyond a reasonable doubt that any error in considering the Youth Authority commitment was harmless. ■■■ We do not agree that the court's reference to defendant's calm demeanor during the trial was improper. A defendant's demeanor may reflect remorse, or otherwise arouse sympathy in either jury or judge. Because the jury, and the

---

[51] Defendant also claims that consideration of the robbery in the John Street Park in Modesto was error because the jury had not found beyond a reasonable doubt that defendant committed that offense. This claim lacks merit for the reasons discussed above—the evidence was introduced by defendant. We need not decide, therefore, whether the judge must apply the same standard of proof in ruling on a motion for modification as does the jury in its determination of the appropriate penalty.

judge in deciding whether to modify a verdict of death, must be permitted to consider any evidence that is relevant and potentially mitigating (*People v. Lanphear, supra,* 36 Cal.3d 163, 167), this is relevant to appropriate consideration.

Defendant's claim that the court should not have considered irrelevant statutory factors, and his suggestion that in finding them absent he necessarily found aggravation lacks merit for the reasons discussed above. Awareness and consideration of the factors the state considers particularly relevant to the penalty decision is no less important to the judge in reviewing the jury's decision than to the jury.

Defendant also attacks the court's recital that the only explanation for his conduct offered by defendant was his hatred of Mexicans. This, he claims, is inaccurate as defendant offered several other explanations, among which were drugs and alcohol. We find no impropriety. The court did not accept defendant's evidence of drug and/or alcohol intoxication. Although there was another motive for the killing, robbery, defendant's willingness to kill was clearly influenced by his dislike of Mexicans. We cannot and do not require the court to blind itself to this in determining whether any belief in moral justification or other mitigating factor was present.

### PROPORTIONALITY

Finally, defendant claims that the death penalty is disproportionate to the offenses in light of the facts of the offenses, his background, and his personal characteristics. This claim, made in anticipation that the decision of the Court of Appeals for the Ninth Circuit in *Harris* v. *Pulley* (9th Cir. 1982) 692 F.2d 1189, would control the type of proportionality review to be given by this court, was premature. (See *Pulley* v. *Harris, supra,* 465 U.S. 37.) Although we believe that proportionality review is not constitutionally mandated (see *People* v. *Rodriguez, supra,* 42 Cal.3d 730, 778), we have, as the court in *Pulley* noted we would do, reviewed the record. We have concluded that the evidence supports the special circumstances of multiple murder, murder in the commission of robbery, and murder in the commission of kidnapping. We have also concluded that no error affected the verdicts of guilt, the special circumstances, sanity, or penalty. No basis appears upon which to conclude the death penalty in this case is disproportionate or otherwise violates the Eighth Amendment to the United States Constitution or article I, section 17 of the California Constitution.

The judgment is affirmed. The order to show cause is discharged and the petition for writ of habeas corpus is denied.

Lucas, C. J., Panelli, J., and Arguelles, J., concurred.

**MOSK, J.**—I concur in the judgment. I am of the opinion that there occurred no prejudicial error going to guilt, that the multiple-murder special-circumstance finding is unquestionably valid, and that there occurred no prejudicial error going to penalty.

I cannot, however, join in the opinion of the court: I disagree with the majority's conclusion that the felony-murder special-circumstance findings are valid.

To begin with, I believe that advancement of an independent felonious purpose is an element of the felony-murder special circumstance and as such should have been instructed on in connection with each of the felony-murder special circumstances alleged in this case. We held as much in *People* v. *Green* (1980) 27 Cal.3d 1, 61-62. The majority choose not to dispute this point and, in my view, simply cannot do so.

Further, contrary to the majority's conclusion, I believe that failure to instruct on the independent-felonious-purpose element is not subject to general harmless-error analysis, and that on this record the error cannot be held nonprejudicial. My reasons are as follows.

In *People* v. *Kimble* (1988) 44 Cal.3d 480 [244 Cal.Rptr. 148, 749 P.2d 803], I demonstrated that failure to instruct on an element of a special circumstance is automatically reversible, subject to the following exceptions: (1) the erroneous instruction was given in connection with a special circumstance allegation that was not found true; (2) the defendant conceded the issue underlying the element; and (3) the issue was necessarily resolved adversely to the defendant under other, properly given instructions. (*Id.* at pp. 517-526 (conc. opn. of Mosk, J.).)

In my opinion, none of the exceptions is available on this record: first, the erroneous instruction was given in connection with each of the felony-murder special-circumstance allegations found to be true; second, defendant did not concede the issue of independent felonious purpose; third, the issue was not necessarily resolved adversely to him under other, properly given instructions—indeed, it was not even presented for the jury's consideration.

In summary, I would conclude that the trial court erred by failing to instruct on independent felonious purpose with regard to the felony-murder special-circumstance allegations. I would further conclude that on this record the error cannot be deemed harmless with respect to the allegations found true.

Nevertheless, since the multiple-murder special circumstance is unquestionably valid, death eligibility has been established. In view of that fact and

in the absence of prejudicial error at the guilt or penalty phase, I am compelled to concur in the judgment.

**KAUFMAN, J.**—Notwithstanding the numerous trial errors and defects identified in the majority opinion, I have concluded that on the basis of the entire record there is no reasonable possibility that absent these errors and defects, the jury would have reached determinations more favorable to defendant. I therefore concur in the judgment affirming the convictions, the special circumstances findings as modified and the penalty of death.

Broussard, J., concurred.

Appellant's petition for a rehearing was denied May 9, 1988, and the opinion was modified to read as printed above.